United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 4, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 05-20646

———————————

THOMAS H BARANOWSKI

            Plaintiff - Appellant

    v.

CHAPLAIN LARRY HART; LAWRENCE N HODGES, Huntsville Unit Warden;
TED SANDERS, Rabbi TDCJ Chaplaincy Department; BILL PIERCE, TDCJ
Chaplaincy Department; DOUGLAS DRETKE, TDCJ-ID Director

            Defendants - Appellees

———————————

Appeal from the United States District Court
for the Southern District of Texas, Houston

———————————

Before HIGGINBOTHAM, WIENER, and PRADO, Circuit Judges.

PRADO, Circuit Judge:

    In this appeal, a Texas prisoner contends that the
defendants-appellees violated his rights under the First
Amendment, the Fourteenth Amendment, and the Religious Land Use
and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1 et seq.,
by failing to provide weekly Sabbath and other holy day services,
by failing to allow Jewish prisoners to use the chapel for their
religious services, and by failing to provide him with a kosher
diet.  He also alleges that he was improperly denied appointment

-1-

of counsel, an evidentiary hearing, and his right to a jury trial. For the reasons that follow, we AFFIRM the district court's order granting summary judgment in favor of the defendants-appellees.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Thomas H. Baranowski ("Baranowski"), an inmate incarcerated in the Huntsville Unit of the Texas Department of Criminal Justice ("TDCJ"), proceeding pro se and *in forma pauperis*, filed a civil rights complaint in federal district court, pursuant to 42 U.S.C. § 1983, against employees and officials of the TDCJ: Defendants-Appellees Larry Hart ("Hart"), Huntsville Unit Chaplain; Lawrence Hodges, Huntsville Unit Warden; Ted Sanders, Rabbi for the TDCJ; Bill Pierce ("Pierce"), Director of the TDCJ Chaplaincy Department; and Douglas Dretke, former Director of the TDCJ (collectively, "Defendants").[1] Baranowski's complaint sought declaratory and injunctive relief for alleged violations of the First Amendment, the Fourteenth Amendment, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1 et seq.[2]

---

[1] Baranowski subsequently moved to dismiss Rabbi Ted Sanders as a defendant, and the motion was granted.

[2] Baranowski's complaint also alleged violations of the Fifth and Ninth Amendments, the Americans with Disability Act, the Rehabilitation Act, and the Texas Religious Freedom Act, as well as a § 1983 retaliation claim. Baranowski has not challenged the district court's ruling on these issues, and we decline to consider these claims any further on appeal. See

-2-

Baranowski, a member of the Jewish faith, alleged that Defendants "denied Jewish prisoners access to Sabbath services while depriving them of worship and fellowship and holyday [sic] services, meals and observances and finally discriminating against Jewish prisoners and favoring other faith groups in regard to chapel services, worship and rehabilitation." More specifically, Baranowski asserted that Defendants had deprived him and other Jewish inmates of access to Friday Sabbath services in September and October 2003 and High Holy Day services, had deprived him and other Jewish inmates of access to the Huntsville Unit chapel for their religious observances, and had failed to provide kosher diets conforming with the dietary laws of Judaism. Baranowski also claimed that prisoners of other religious faiths were treated more favorably than Jewish prisoners, citing limited religious services and chapel access for Jewish prisoners.[3]

Defendants moved for summary judgment, filing copies of various prison policies and sworn affidavits in support. In his affidavit, Pierce, the Director of the TDCJ Chaplaincy Department, testified that "TDCJ allows all offenders to worship according to their faith preference in their cell[s] using

---

Yohey v. Collins, 985 F.2d 222, 224-25 (5th Cir. 1993) (stating that pro se litigants must brief arguments to preserve them for appellate review).

[3] Although Baranowski listed other inmates as additional plaintiffs, the district court concluded that Baranowski was the only plaintiff in this lawsuit. Baranowski has not challenged this ruling on appeal.

-3-

allowed items such as sacred texts, devotional items, and materials." According to Pierce, TDCJ policy is to allow inmates as much freedom and opportunity as possible for pursuing their individual beliefs and practices, consistent with agency security, safety, order, and rehabilitation concerns. Pierce explained that religious services are provided based on demand, need, and resources. He further testified that "[c]haplaincy services are nondiscriminatory in the treatment of offenders' religious beliefs, but TDCJ policy attempts to take space, time, and staffing restraints into consideration."

Pierce stated that of the 145,000 offenders currently confined in TDCJ, only 900 are self described as Jewish. Of those, only 70 to 75 are "recognized" as actually practicing their faith, with 90 in the conversion process. According to Pierce, these numbers are very small when compared to the number of observant Protestants, Catholics, and Muslims.

Pierce also stated that although Jewish programs and activities are not available at every unit, they are available at the Huntsville Unit, which is one of seven Jewish "host" units within the TDCJ. He explained that "[r]abbis, not offenders, lead Jewish services to ensure that religious practices reflect Jewish doctrines. There is no other way for TDCJ to accommodate the demand for Jewish congregational services from practicing Jews." According to Pierce, "[b]ecause of the small number of inmates who actually practice Judaism and attend Jewish services,

-4-

as well as the limited availability of rabbis in certain geographical areas of the state, TDCJ is unable to hold Jewish services at every Jewish host unit on a weekly basis." Pierce testified that services are held at least monthly at each of the Jewish host units. Pierce explained that in addition to monthly services, however, the TDCJ recognizes twenty-one Jewish holy days (compared with two for Christians), and that time off is permitted for eight of those days.

Pierce also testified about the numerous requests that TDCJ receives from inmates for special diets for religious reasons. He explained that:

> While TDCJ tries to accommodate inmates' religious needs, it must take into account the orderly administration of the prison and its resources while not giving any single inmate or group of inmates preferential treatment. If TDCJ were to grant one inmate's request for a special diet or religious item, numerous inmates would request similar special privileges.
>
> . . . .
>
> TDCJ has reviewed requests for kosher diets and has studied the impact of complying with such a request, by either providing a separate kosher kitchen or by bringing in kosher food from the outside. TDCJ has determined that it would be far too costly and would far exceed the allotted budget to provide kosher food. No TDCJ unit is currently set up to accommodate a kosher diet, which requires food preparation under certain ritual requirements and without contact with non-kosher food. Given the small number of offenders identifying themselves as Jewish (and the small number recognized as practicing Jews by TDCJ Jewish authorities), and their various classification and programmatic needs, at least several units would have to remodel their kitchens and substantially alter food preparation procedures. Kosher meals also are very costly. The state of Florida has reported that it costs them between 12 and 15 dollars per

day per offender to provide kosher meals compared with $2.46 per day the State of Texas pays for offender meals. Providing kosher meals for a very small subset of offenders would place a tremendous burden on the ability of TDCJ to provide a nutritionally appropriate meal to all other offenders because of the budgetary impact alone. Furthermore, due to budget deficits, the Texas Legislature at the last legislative session specifically targeted inmate food services for a mandatory reduction in the biennial of more than $6 million. Providing kosher meals would put a great strain on an already strained system, and would raise resentment among other inmates because payments for kosher meals would of necessity come out of the general food budget for all inmates. The problem would be compounded because inmates of other faiths would seek similar privileges.

Pierce testified that as an alternative to kosher meals, "all inmates may choose to be served a pork-free diet or a vegetarian diet." In addition, Jewish inmates may receive kosher items from the Aleph Institute, a not-for-profit organization, at no cost to the state of Texas.

Prison policy 3.01, which Defendants included with their summary judgment motion, elaborates on TDCJ's diet policy and substantiates Pierce's testimony. It declares that the "[g]eneral population may select a regular tray, a meat-free tray, or a pork-free tray from the food service line. Any type of meal may be selected from meal to meal." It goes on to state:

> [t]o assure minimal nutritional needs are met, menu item replacements using one of three options shall be made when meat or pork is not served:
>
> • Option 1 - 1 oz. of sliced cheese, additional 4 oz. of beans and additional serving of bread.
> • Option 2 - 1 hard-boiled egg and 1 peanut butter and jelly sandwich.
> • Option 3 - 1 peanut butter and jelly sandwich and additional 4 oz. serving of beans.

-6-

Finally, the policy adds that while chaplains may assist offenders in understanding what the food preferences or restrictions are for various religions, it is the offender's responsibility to follow dietary preferences or restrictions based on his designated faith preference.

Defendants also introduced affidavit testimony of Hart, a chaplain at the Huntsville Unit, in support of their summary judgment motion. Hart testified that because rabbis or approved outside volunteers lead Jewish services, "[s]cheduled events may be delayed or canceled when qualified spiritual leaders are not available." The Huntsville Unit has a contract rabbi who works with Hart to schedule Jewish services, order religious items, and authorize time off for Jewish holy days. Hart explained that Jewish services in September and October 2003 were canceled, as complained of by Baranowski, because a rabbi or qualified volunteer was not available.

Hart also testified about the use of the Huntsville Unit chapel. He explained that Friday night Sabbath services for the twelve Jewish inmates who routinely attend are held in the Education Department and not the chapel because the chapel is made available to the New Birth Bible Program, a group consisting of approximately 175 participants. Hart pointed out that the chapel is open to all offenders from 10:30 a.m. until 11:30 a.m. on Monday through Thursday for religious study.

The district court granted summary judgment and entered a judgment dismissing the complaint with prejudice. The district court held that the summary judgment evidence showed that restrictions on Baranowski's religious observances were justified by valid penological interests related to prison staffing, space limitations, and the financial burden of accommodating Baranowski's requests. The district court concluded that Baranowski had not shown that Defendants purposefully discriminated against him or that similarly situated individuals were treated differently. The district court also held that Baranowski had failed to present prima facie evidence that Defendants had "substantially burdened" his religious practices under RLUIPA. The district court concluded that even assuming Baranowski were to establish a substantial burden on his religious observance, "defendants' financial, safety, space, and security concerns for the prison, its inmates, and employees, and the goal of maintaining a neutral policy of religious accommodation for all recognized religious faiths, are compelling governmental interests."

Baranowski now appeals. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## II. STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo. Freeman v. Tex. Dep't of Criminal Justice, 369 F.3d 854,

859 (5th Cir. 2004). Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). If the movant satisfies its initial burden of demonstrating the absence of a material fact issue, then "'the non-movant must identify specific evidence in the summary judgment record demonstrating that there is a material fact issue concerning the essential elements of its case for which it will bear the burden of proof at trial.'" Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc) (quoting Forsyth v. Barr, 19 F.3d 1527, 1533 (5th Cir. 1994) (citations omitted)). "However, the nonmovant cannot satisfy this burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." Freeman, 369 F.3d at 860.

### III. DISCUSSION

Baranowski's appeal raises three challenges to the district court's summary judgment ruling: the dismissal of his free exercise claim; the dismissal of his equal protection claim; and the dismissal of his RLUIPA claim.[4] Baranowski also contends

---

[4] Two additional issues raised by Baranowski can be disposed of here. First, Baranowski attempts to appeal the district court's denials of his motions for temporary restraining orders, but it is well established in this circuit that the

that he was wrongly denied appointment of counsel, an evidentiary hearing, and the right to his day in court. We address each issue in turn.

## A.    Free Exercise Claim

Baranowski argues that Defendants have impeded his free exercise of religion under the First Amendment by denying him access to Jewish Sabbath and other holy day services, by depriving him of kosher meals required by his faith, and by denying him access to the Huntsville Unit chapel for religious observances. Defendants counter that valid penological objectives, including security, staff and space limitations, and financial burdens, justify TDCJ's policies, and that Baranowski has alternative means of practicing his religion.

This court reviews prison policies that impinge on fundamental constitutional rights under the deferential standard set forth in Turner v. Safley, 482 U.S. 78 (1987). Under Turner, a prison regulation that impinges on an inmate's constitutional rights is valid if it is reasonably related to legitimate penological interests. Id. at 89. Turner requires the court to

---

denial of an application for a temporary restraining order is not appealable. See House the Homeless, Inc. v. Widnall, 94 F.3d 176, 180 n.8 (5th Cir. 1996). Second, Baranowski contends in his reply brief that he has raised a claim of "denial of due process rights to practice his Jewish faith." However, he has done nothing more than mention this as an issue, without any reference to it in the argument section of his initial or reply brief or any citation of legal authority. We decline to consider it further on appeal. See Yohey, 985 F.2d at 224-25.

consider four factors: (1) whether a valid and rational connection exists between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact of the accommodation on prison guards, other inmates, and the allocation of prison resources generally; and (4) whether there are "ready alternatives" to the regulation in question. Id. at 89-90. "A court 'must determine whether the government objective underlying the regulation at issue is legitimate and neutral, and that the regulations are rationally related to that objective.'" Freeman, 369 F.3d at 860 (quoting Thornburgh v. Abbott, 490 U.S. 401, 414-15 (1989)); see also Scott v. Miss. Dep't of Corr., 961 F.2d 77, 80-81 (5th Cir. 1992) (explaining that a court need not "weigh evenly, or even consider, each of these factors," as rationality is the controlling standard).

Turning to the Turner factors, we hold that the TDCJ policies on the availability of religious services and use of the chapel pass constitutional muster. In so holding, we are guided by this circuit's recent decision in Adkins v. Kaspar, 393 F.3d 559 (5th Cir. 2004).

In Adkins, the plaintiff argued that his free exercise rights were denied when he and other members of the Yahweh Evangelical Assembly ("YEA") were not permitted to assemble on every Sabbath day and on particular holy days because no

-11-

volunteer deemed acceptable by the defendants was available to supervise the meetings. 393 F.3d at 564. Applying the Turner factors, the court in Adkins first recognized that this court had recently held that the TDCJ's religious accommodation policy is rationally related to legitimate government objectives. Id. (citing Freeman, 369 F.3d at 861); see also Freeman, 369 F.3d at 861 (holding that TDCJ's religious accommodation policy "is neutral--it 'operate[s] . . . without regard to the content of the expression'") (quoting Turner, 482 U.S. at 90). The court then looked to the second Turner factor, recognizing that "'[t]he pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith.'" Adkins, 393 F.3d at 564 (quoting Freeman, 369 F.3d at 861). The court concluded that YEA members had alternative means of exercising their religion, given their access to religious materials and their ability to hold and attend live services when a spiritual leader was available. Id. Applying the third Turner factor, the court reasoned:

> The 20 to 25 active members of YEA constitute less than one percent of the large inmate population at Coffield. Requiring the defendants to accommodate every religious holiday and requirement of the YEA, regardless of the availability of volunteers, space, or time, could "spawn a cottage industry of litigation and could have a negative impact on prison staff, inmates and prison resources." Moreover, if Adkins were accommodated and other similarly situated small religious groups were not, the YEA could appear to be favored over the others, a perception that could have a negative effect on prison

-12-

morale and discipline.

Id. at 565 (quoting Freeman, 369 F.3d at 862).  Finally, under the fourth Turner prong, the court determined that "no obvious, easy alternatives would accommodate both Adkins and the TDCJ's administrative needs."  Id. (internal quotation marks and citation omitted).  The court concluded that in light of the Turner factors, the dismissal of the plaintiff's free exercise claim was proper.

We reach the same result in the instant case pursuant to Turner on facts that are not materially different from Adkins. The record demonstrates that the prison policies at issue here are logically connected to legitimate penological concerns of security, staff and space limitations, and that there are no obvious or easy alternatives.  Baranowski's main complaint is that the prison could accommodate the need for weekly Jewish services if inmates were permitted to lead the services without the assistance of a rabbi or approved outside volunteer. However, Adkins rejected this argument, and we do so again here. The summary judgment evidence shows that despite being denied weekly Sabbath services and other holy day services when a rabbi or approved volunteer is not present, Baranowski retains the ability to participate in alternative means of exercising his religious beliefs, including the ability to worship in his cell using religious materials and the ability to access the chapel and lockers containing religious materials on certain days and

times.[5]  See O'Lone v. Estate of Shabazz, 482 U.S. 342, 351-52 (1987) (upholding a regulation that prevented Muslim prisoners from attending Friday Jumu'ah services, and recognizing that although there were "no alternative means of attending Jumu'ah [since] respondents' religious beliefs insist that it occur at a particular time," inmates were "not deprived of all forms of religious exercise, but instead freely observe a number of their religious obligations"); see also Turner, 482 U.S. at 90 ("Where other avenues remain available for the exercise of asserted rights, courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation.") (internal quotation marks, citations, and alterations omitted).  Finally, the Jewish population at the TDCJ constitutes less than one percent of the total inmate population.  If this court were to require the TDCJ to accommodate every religious holiday and requirement of the Jewish faith, regardless of the availability of qualified volunteers and adequate space and security, we "would spawn a cottage industry of litigation and could have a negative impact on prison staff, inmates, and prison resources."  Freeman, 369 F.3d at 862.  We decline to yield to Baranowski's demands.

We reach the same result on TDCJ's policy of not providing

_____

    [5]  Although Baranowski contends that some inmates could not take advantage of the weekday religious study in the chapel because of work assignments, he does not claim that he was not able to do so himself.

-14-

kosher meals. This circuit has already ruled that prisons need not respond to particularized religious dietary requests to comply with the First Amendment. See Kahey v. Jones, 836 F.2d 948 (5th Cir. 1988); Udey v. Kastner, 805 F.2d 1218 (5th Cir. 1986).

In Kahey, we held that the prison was not required to accommodate a Muslim inmate's request for a kosher diet, with particularized requirements regarding the content and preparation of food. 836 F.2d at 950-51. In applying the Turner factors, the court concluded that there was a logical connection between the prison policy on inmate diet and the "legitimate governmental interest in running a simplified prison food service rather than a full-scale restaurant." Id. at 950. The court also determined that the inmate's practice of Islam was "not entirely circumscribed in the prison, and that this factor, as the [Supreme Court] found in O'Lone, compensates for the prison's failure to satisfy her dietary demand." Id. at 951. The court concluded that the impact of granting the inmate's request would be expensive, diverting resources from other penological goals, and could result in the perception that certain inmates were favored over others, which would have an adverse impact on prison morale. Id. Finally, the court found that there were simply no ready alternatives to satisfy the inmate's dietary requirements at a *de minimis* cost to the prison. Id.; see also Turner, 482 U.S. at 91.

Udey, decided before the Supreme Court's decision in Turner, also held that the First Amendment did not require a prison to provide an inmate with a diet consistent with his religious beliefs. 805 F.2d at 1221. The court reasoned that meeting the inmate's religious and dietary requirements would place undue costs and administrative burdens on the prison system because of the likelihood of proliferation of such requests and the concomitant need to meet multiple distinct dietary requests. Id.

For the reasons stated by the courts in Kahey and Udey, we conclude that denial of a kosher diet does not violate Baranowski's free exercise rights. Consequently, we affirm the district court's dismissal of Baranowski's First Amendment claim.

## B.   Equal Protection Claim

Baranowski next alleges that Defendants violated his equal protection rights by favoring other religions over Judaism. Specifically, he contends Christian and Muslim services are conducted more frequently than Jewish services, and that other groups have greater access to the chapel. Defendants respond that Baranowski has provided no summary judgment evidence of purposeful discrimination regarding any of his allegations.

To succeed on his equal protection claim, Baranowski "'must prove purposeful discrimination resulting in a discriminatory effect among persons similarly situated.'" Adkins, 393 F.3d at 566 (quoting Muhammad v. Lynaugh, 966 F.2d 901, 903 (5th Cir. 1992)). "However, the Fourteenth Amendment does not demand 'that

-16-

every religious sect or group within a prison--however few in numbers--must have identical facilities or personnel.'" <u>Freeman</u>, 369 F.3d at 862-63 (quoting <u>Cruz v. Beto</u>, 405 U.S. 319, 322 n.2 (1972)).  Rather, prison officials must afford prisoners "reasonable opportunities . . . to exercise the religious freedom guaranteed by the First and Fourteenth Amendment[s]."  <u>Cruz</u>, 405 U.S. at 322 n.2.  "<u>Turner</u> applies with corresponding force to equal protection claims."  <u>Freeman</u>, 369 F.3d at 863.

Baranowski's equal protection claim must fail.  He has offered no competent summary judgment evidence that similarly situated faiths are afforded superior treatment, or that TDCJ's policies are the product of purposeful discrimination.[6]  Although Baranowski claims that other religious groups have greater access to the chapel, it is recognized that "[a] special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand."  <u>Cruz</u>, 405 U.S. at 322 n.2.  It is therefore not constitutionally impermissible for Defendants to consider the demand and need of the group requesting the chapel, along with space and staffing limitations, when deciding where religious groups will conduct their services.  <u>See</u> <u>id.</u> (noting that the Constitution does not demand that every

---

[6]  To the extent Baranowski is raising an equal protection claim regarding the denial of kosher meals, the uncontroverted summary judgment evidence shows that the TDCJ does not serve kosher meals to any inmate.

religious group, regardless of size, have identical facilities).

In sum, Baranowski has failed to provide anything more than bald and unsubstantiated allegations that Defendants purposefully discriminated against him.  This is not enough to succeed on an equal protection claim.  See Adkins, 393 F.3d at 566.  We therefore affirm the district court's dismissal of this claim.

## C.   RLUIPA Claim

Baranowski next argues that his inability to observe Sabbath and other holy day services and his inability to consume kosher meals substantially burden his ability to practice Judaism, in violation of RLUIPA.  As a "Torah-observant Jew," Baranowski claims that he is compelled to observe the Sabbath and other holy days and to consume kosher food.  He contends that the substantial burdens imposed by Defendants pressure him to modify his behavior and to violate his sincerely held religious beliefs.  Defendants counter that Baranowski has failed to establish that his religious practices are substantially burdened.  In the alternative, Defendants argue that their policies are the least restrictive means of furthering their compelling interests of security, safety, space, personnel, and financial concerns for the prison and its inmates and employees.

RLUIPA mandates that

[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that

-18-

person--

(1) is in furtherance of a compelling governmental interest; and
(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." Cutter v. Wilkinson, 544 U.S. 709, 721 (2005).

The threshold inquiry under RLUIPA is whether the challenged governmental action substantially burdens the exercise of religion. The burden of proving the existence of a substantial interference with a religious exercise rests on the religious adherent. 42 U.S.C. § 2000cc-2(b). If such a substantial burden is proven, it is then up to the government to demonstrate that the compelling interest test is satisfied. See id.

RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." Id. § 2000cc-5(7)(A).[7] "'[T]he 'exercise of religion' often involves not only belief and profession but the performance of . . . physical acts [such as] assembling with

_____

[7] "Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion . . . the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity." Cutter, 544 U.S. at 725 n.13. Here, however, Defendants have not argued that Baranowski is not sincere in his beliefs, and the record gives us no reason to question the sincerity of his religious beliefs.

-19-

others for a worship service [or] participating in sacramental use of bread and wine . . . .'" Cutter, 544 U.S. at 720 (quoting Employment Div., Dep't of Human Res. of Ore. v. Smith, 494 U.S. 872, 877 (1990)). There is no question that the activities alleged to be burdened in this case--Jewish Sabbath and holy day services and keeping kosher--qualify as "religious exercises" for the practice of Judaism under RLUIPA's generous definition. See Adkins, 393 F.3d at 567-68 (stating that Sabbath and holy day gatherings "easily qualify as 'religious exercise'"); Guzzi v. Thompson, 470 F. Supp. 2d 17, 25 (D. Mass. 2007) (stating that the practice of "keeping kosher" constitutes a religious exercise for the Jewish faith).

In Adkins, we considered the meaning of "substantial burden," which is not defined by the statute. We held that "for purposes of applying the RLUIPA in this circuit, a government action or regulation creates a 'substantial burden' on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." 393 F.3d at 569-70. The court cautioned, however, that "our test requires a case-by-case, fact-specific inquiry to determine whether the government action or regulation in question imposes a significant burden on an adherent's religious exercise . . . ." Id. at 571.

We first consider whether Baranowski's religious exercise was substantially burdened when he was prevented from

-20-

congregating with other Jewish inmates on many Sabbath and Jewish holy days.  The uncontroverted summary judgment evidence shows that on the days Baranowski claims that services were not provided, no rabbi or approved religious volunteer was available to lead the services.  This court considered a similar claim under RLUIPA in Adkins; the plaintiff in that case was prevented from gathering with other YEA members for various religious observances.  We explained that the plaintiff and other YEA members were not prevented from congregating by prison policy but by the dearth of clergy and authorized volunteers.  Id.  We held that the requirement of an outside volunteer did not place a substantial burden on the plaintiff's religious exercise under RLUIPA.  Id.  In light of this court's decision in Adkins and the summary judgment evidence before us, we are convinced that the acts of Defendants regarding religious services have not placed a substantial burden on Baranowski's free exercise of his Jewish faith, within the contemplation of RLUIPA.  See id.

We next consider whether the failure of Defendants to provide Baranowski with a kosher diet constitutes a substantial burden on his religious exercise.  Baranowski argues that his inability to consume kosher food has pressured him to modify his behavior and to violate his sincerely held religious beliefs.  Cf. Ran-Dav's County Kosher, Inc. v. New Jersey, 608 A.2d 1353, 1355-56 (N.J. 1992) (describing Jewish dietary laws and their significance to Judaism).  Given the strong significance of

-21-

keeping kosher in the Jewish faith, the TDCJ's policy of not providing kosher food may be deemed to work a substantial burden upon Baranowski's practice of his faith.

Turning to the compelling interest test, Defendants must show that their dietary policy of not providing kosher meals is the least restrictive means of furthering a compelling governmental interest.  As the Supreme Court recently explained, "'[c]ontext matters' in the application of that standard." Cutter, 544 U.S. at 723 (quoting Grutter v. Bollinger, 539 U.S. 306, 327 (2003)).  Courts should apply the "compelling governmental interest" standard with "'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'"  Id. (quoting S. REP. NO. 103-111, at 10 (1993)).  RLUIPA, in other words, is not meant to elevate accommodation of religious observances over the institutional need to maintain good order, security, and discipline or to control costs.  See Lovelace v. Lee, 472 F.3d 174, 190 (4th Cir. 2006).

The uncontroverted summary judgment evidence submitted by Defendants establishes that TDCJ's budget is not adequate to cover the increased expense of either providing a separate kosher kitchen or bringing in kosher food from the outside; that TDCJ's ability to provide a nutritionally appropriate meal to other

-22-

offenders would be jeopardized (since the payments for kosher meals would come out of the general food budget for all inmates); that such a policy would breed resentment among other inmates; and that there would be an increased demand by other religious groups for similar diets.

Based on the record before us, we hold that this policy is related to maintaining good order and controlling costs and, as such, involves compelling governmental interests. Cf. Andreola v. Wisconsin, No. 06-1491, 2006 WL 3724633, at *3 (7th Cir. Dec. 18, 2006) (unpublished) (finding no RLUIPA violation where the defendant did not provide kosher meals based on the compelling governmental interests of maintaining security and "abating the costs of a prisoner's keep"). Further, the administrative and budgetary interests at stake cannot be achieved by any different or lesser means. Cf. Cutter, 544 U.S. at 726 ("Should inmate requests for religious accommodations become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition."). Accordingly, we conclude that the district court properly granted summary judgment on Baranowski's RLUIPA claim.

**D.    Other Claims**

Lastly, Baranowski claims that the district court erred in denying his request for appointment of counsel and by not giving him an evidentiary hearing or his day in court. These claims are

without merit.

Under 28 U.S.C. § 1915(e)(1), the court may appoint an attorney to represent a litigant in federal court, but there is no automatic right to appointment of counsel in a civil rights case. See Castro Romero v. Becken, 256 F.3d 349, 353-54 (5th Cir. 2001). "In evaluating whether the appointment of counsel is proper, the district court considers the type and complexity of the case, the litigant's ability to investigate and present the case, and the level of skill required to present the evidence." Id. at 354. We review the district court's denial of appointment of counsel for an abuse of discretion. Id.

The district court held that Baranowski did not have a right to court-appointed counsel because of his "demonstrated ability to litigate his case" and "the elementary nature of [the] issues" involved in the case. After reviewing the record, we conclude that the district court did not abuse its discretion.

We also conclude that Baranowski has failed to show how his claims would have been advanced by an evidentiary hearing. He argues that he has not been given a chance to present "real evidence to support his wholesome claims." Baranowski has not shown why a hearing is needed to bring forth such evidence or why he did not present this evidence in his opposition to Defendants' motion for summary judgment. Accordingly, we cannot hold that the district erred in not conducting an evidentiary hearing.

Finally, Baranowski's claim that he was denied a jury trial

-24-

is frivolous.  Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment if the appropriate materials on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  As this court has explained, "[t]he function of the jury is to try the material facts; where no such facts are in dispute, there is no occasion for jury trial.  Thus the right to trial by jury does not prevent a court from granting summary judgment."  <u>Plaisance v. Phelps</u>, 845 F.2d 107, 108 (5th Cir. 1988).  When the district court properly entered summary judgment dismissing Baranowski's claims, his demand for a jury trial became moot.  <u>See</u> <u>id.</u>

## IV.  CONCLUSION

For the reasons stated above, we affirm the district court's grant of summary judgment.

AFFIRMED.