IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 20, 2013

Lyle W. Cayce
Clerk

No. 09-40400

MAX MOUSSAZADEH,

Plaintiff-Appellant,

versus

TEXAS DEPARTMENT OF CRIMINAL JUSTICE;
BRAD LIVINGSTON, Solely in His Official Capacity as Executive Director
of Texas Department of Criminal Justice, Correctional Institutions Division;
DAVID SWEETEN, Solely in His Official Capacity as Warden of
the Eastham Unit of the Texas Department of Criminal Justice,
Correctional Institutions Division,

Defendants-Appellees.

Appeals from the United States District Court
for the Southern District of Texas

ON REQUEST FOR POLL ON REHEARING EN BANC
(Opinion December 21, 2012, 703 F.3d 781)

Before KING, SMITH, and BARKSDALE, Circuit Judges.

PER CURIAM:

The court having polled at the request of a member of the court (see Internal Operating Procedure accompanying 5TH CIR. R. 35, "Requesting a Poll on Court's Own Motion"), and a majority of the judges who are in regular active service and not disqualified not having voted in favor (see FED. R. APP. P. 35(a) and 5TH CIR. R. 35.6), rehearing en banc is DENIED.[*]

In the en banc poll, 7 judges voted in favor of rehearing (Judges Jolly, Jones, Clement, Prado, Owen, Southwick, and Higginson), and 8 judges voted against rehearing (Chief Judge Stewart and Judges King, Davis, Smith, Dennis, Elrod, Haynes, and Graves).

ENTERED FOR THE COURT:

___/s/ Jerry E. Smith_____
United States Circuit Judge

---

[*] The panel hereby corrects a typographical error. In the opinion, 703 F.3d at 795, the phrase "less than .005% of the food budget" should read "less than .05% of the food budget."

E. GRADY JOLLY, Circuit Judge, dissenting from denial of rehearing en banc:

On remand, the district court should, as I know it will, recognize that Baranowski v. Hart is the earlier precedent and to the extent that the panel opinion is deemed to conflict with Baranowski, Baranowski controls. 486 F.3d 112 (5th Cir. 2007). Failing to begin and end its analysis with Baranowski, the panel opinion appears to have sidestepped the rule that one panel cannot overrule another. The panel opinion, however, also contains other grave errors.

To set the stage, this appeal involves the Texas Department of Criminal Justice's ("TDCJ") efforts to accommodate the religious practice of keeping kosher of roughly 900 Jewish prisoners among an inmate population greater than 140,000; TDCJ's establishment of a "Jewish prison unit" with a kosher kitchen; a single Jewish prisoner, Moussazadeh, whose demands were thus accommodated, even though they were not required to be by any court decision; major disciplinary infractions – committed by Moussazadeh – that required his transfer to a more secure prison that did not have a kosher kitchen but nonetheless offered vegetarian and non-pork options and where pre-packaged kosher food in the more secure prison's commissary was available for purchase; and, finally, the demands of Moussazadeh to be served kosher food, necessarily prepared by a kosher kitchen at the secured facility, even when he later had the option of being transferred back to the Jewish prison.

The case further presents a panel decision that ignores this context, avoids precedent, attempts to establish new requirements for Texas prisons, and gives a deaf ear to the concerns of the Texas prison officials, all notwithstanding a strong dissent by Judge Barksdale. At issue is an important federal statute, The Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc et seq., and the question of the extent to which TDCJ is required to address the religious dietary requests of prisoners. The panel, however, in

3

deciding the application of the statute, appears to have been blind to the principle that "[c]ontext matters." Cutter v. Wilkinson, 544 U.S. 709, 723 (2005) (internal quotation marks omitted). I elaborate on the importance of context in deciding the case, among other matters, in what follows.

I.

A few basic facts are necessary to recount. While serving a seventy-five year sentence for murder, inmate Max Moussazadeh filed a series of grievances with the TDCJ complaining that, while incarcerated, he was not provided kosher food in violation of the tenets of Jewish kashrut (dietary laws). TDCJ denied his grievances.[1] In response, Moussazadeh sued TDCJ in federal court, alleging substantially the same facts as in his grievances. He argued that he was a sincere adherent of the Jewish faith and that a fundamental tenet of his religion requires that believers eat food prepared and served in a kosher manner. He based his federal claims on RLUIPA, which generally forbids governmental entities from "impos[ing] a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability." 42 U.S.C. § 2000cc-1(a). Of relevance, however, is Moussazadeh's frequent purchase and consumption of food items like coffee and soda from his prison's commissary. Such items were not certified as kosher, and certain adherents of Judaism would consider consuming them to be a violation of kashrut.

Nevertheless, TDCJ elected to try to settle outside of court. In settlement negotiations, Moussazadeh's demands were accommodated.[2] TDCJ began

---

[1] At all times, Moussazadeh was allowed to select a "non-pork" option at the prison's dining facility, which, according to TDCJ, "satisf[ies] the religious requirements of 85% of the Jewish population that is not orthodox."

[2] The challenges TDCJ faced in accommodating Moussazadeh included: (1) finding kitchen space and adequate dry and cold food storage to be koshered; (2) installing the

offering kosher food, free of charge, in the dining hall at the Stringfellow Unit, the jail facility where Moussazadeh resided.[3] But somehow settlement attempts were still unsuccessful, and Moussazadeh failed to abandon his claim. Later, Moussazadeh was transferred to a separate facility, the Stiles Unit, after committing a major infraction.[4] The Stiles Unit offered kosher food for purchase at the inmates' commissary but did not offer free kosher food like at Stringfellow. Meanwhile, Moussazadeh's suit proceeded.

The district court granted summary judgment for TDCJ on two grounds: Moussazadeh's claim was barred by the Prison Litigation Reform Act ("PLRA"), which requires inmates to exhaust their administrative remedies before seeking judicially granted relief, and, under RLUIPA, Moussazadeh could not proceed because he was not sincere in his religious beliefs, so there was no substantial burden on his religious exercise. On appeal, the panel majority reversed the grant of summary judgment and remanded the case for further proceedings; Judge Barksdale, disagreeing, submitted a compelling dissent, which I draw on extensively.

## II.

___

necessary utility hookups for cooking, ventilation, and cleaning, (3) acquiring sources of kosher food through the competitive bid process of the State of Texas, (4) acquiring equipment and all cooking implements to be koshered and remain kosher, (5) developing a serving system that maintains the kosher purity of the food from the kitchen to the participating inmate, (6) locating Jewish inmate workers who were (i) medically able, (ii) met the requirements to perform the necessary functions of working in the kitchen, (iii) willing to work in the kitchen in order to maintain the kosher purity of the food, and, (7) finding and hiring a mashgiach who lived near a Texas prison.

[3] At oral argument, however, TDCJ indicated that, while at Stringfellow, Moussazadeh only used the "kosher food line" in the cafeteria about half the time; the other half of the time, he ate normal food from the normal line.

[4] Moussazadeh was found to be in possession of contraband, including cell phone parts and marijuana.

In Baranowski v. Hart, this court decided the question presented in Moussazadeh. 486 F.3d 112. Baranowski expressly held that RLUIPA did not require TDCJ to furnish kosher food. The majority's attempt to neutralize Baranowski, therefore, is unfaithful to its holding that a prison's failure to provide kosher food is "related to maintaining good order and controlling costs and, as such, involves compelling governmental interests." Id. at 125. The majority attempts to cabin Baranowski by referring to the latter case's "thin record," see Moussazadeh v. Tex. Dep't of Criminal Justice, 703 F.3d 781, 795 (5th Cir. 2012), but this is a collateral attack on the opinion of the prior court, since Moussazadeh addresses the identical question: whether RLUIPA requires TDCJ to provide Jewish prisoners with free kosher food. Also important for our purposes is the testimony of the Director of the TDCJ Chaplaincy Department, who in Baranowski stated that "While TDCJ tries to accommodate inmates' religious needs, it must take into account the orderly administration of the prison and its resources while not giving a single inmate or group of inmates preferential treatment." 486 F.3d at 117. The majority opinion in Moussazadeh asserts that "[c]ircumstances since Baranowski have changed," see 703 F.3d at 795, but fails to explain (1) if and why the Director's concerns are now illegitimate, (2) why the TDCJ's changed kosher policy requires us to overrule Baranowski, or (3) why providing kosher meals would not "put a great strain on an already strained system, and would [not] raise resentment among other inmates because payments for kosher meals would of necessity come out of the general food budget for all inmates." Baranowski, 486 F.3d at 118.

## III.

As mentioned above, the majority has flown by the Supreme Court's directive that "[c]ontext matters" in RLUIPA cases. Cutter, 544 U.S. at 723 (internal citations omitted). Here, it is imperative for us to see that the "context

matters" when the right claimed arises inside particular and different prison circumstances; the "context matters" when federal courts have no expertise in handling the logistics and safety concerns of prisons; the "context matters" when Texas expended considerable sums to accommodate this inmate – and all Jewish inmates – by constructing a kitchen that cooked kosher food and effectively establishing a Jewish prison– even when, under this court's precedent, it was not required to do so, Baranowski, 486 F.3d at 125; the "context matters" when, to make this accommodation, which apparently now is demanded for a second prison, Texas had to find space in an already crowded facility, install new utilities, acquire sources of kosher food through state bidding, develop new serving systems, and locate and hire new staff; the "context matters" when Moussazadeh, at significant expense to the state, had the benefit of free kosher kitchen-prepared food until he committed a serious infraction that increased the danger he posed and required his transfer to a more secure facility; the "context matters" when, even after this transfer to the more secure facility, kosher food remained available to the inmate, and vegetarian and non-pork options were also available in the general cafeteria; the "context matters" when, despite these options, the inmate did not consistently keep kosher, indicating the practice was not adhered to in his personal religious rite; the "context matters" when the prisoner, once he proved himself, was eligible for re-transfer back to the Jewish facility with its kosher kitchen and that, when he became eligible, did not avail himself of the transfer option.

## IV.

As we will see, the majority errs in its analysis of each of the three factors of the RLUIPA substantial burden test. Those factors are the identity of the substantial burden on Moussazadeh's religious exercise, the compelling interest of the state, and the least restrictive means of meeting that interest. 42 U.S.C.

§ 2000cc-1(a).

A.

The majority begins its substantial burden analysis by citing First Amendment case law that concerns religious exercise by a Seventh Day Adventist and a Jehovah's Witness, who were never incarcerated and whose religious objections concerned unemployment benefits, not the conditions of confinement. Moussazadeh, 703 F.3d at 793 (citing Sherbert v. Verner, 374 U.S. 398, 404 (1963); Thomas v. Review Bd. of the Ind. Emp't. Sec. Div.; 450 U.S. 707, 717-18 (1981)). Although it is true that this court has before looked to such cases when considering RLUIPA, see Adkins v. Kaspar, 393 F.3d 559, 569 (5th Cir. 2004), citing to these cases in Moussazadeh's context can be misleading. If this court wants to search for a First Amendment beacon for RLUIPA cases, it should look to precedent within the circuit which speaks to the precise matter at issue, the obligation – or lack thereof – of a prison to respond to inmates' particularized religious dietary requests. In this regard, pre-RLUIPA cases like Kahey v. Jones and Udey v. Kastner serve as better starting points and should be considered as background relevant to the application of RLUIPA within our circuit. 836 F.2d 948 (5th Cir. 1988) (holding prison was not required to accommodate inmate's request for kosher diet); 805 F.2d 1218 (5th Cir. 1986) (holding the First Amendment not to require providing an inmate with a diet consistent with his religious beliefs). This First Amendment precedent relating to the prison context is the more appropriate guide to our application of RLUIPA in this case.

After relying on inappropriate authority for support, the majority opinion inappropriately analogizes Sherbert to the furnishing of kosher food in Moussazadeh's case, practically comparing it to the denial of sustenance itself: "Like the unemployment payments at issue in Sherbert, food is an 'essential' benefit given to every prisoner, regardless of religious belief," Moussazadeh, 703

8

F.3d at 793; and, later the majority continues by saying that "Where an inmate is denied a generally available benefit [i.e. food] because of his religious beliefs, a substantial burden is imposed on him." Id. at 794. Of course, no one is denying food to a prisoner because of his religious beliefs. These statements, then, are puzzling; it is unclear what precisely the majority is suggesting. No one disputes that Moussazadeh is given food on a daily basis, that a non-pork or vegetarian option is always available for free in the prisons' dining halls, and that, even at the high-security Stiles prison, kosher products have always been available in the commissary. Kosher kitchen food, or such food to satisfy each religious group, contrary to the majority's opinion, is not "generally" available (rather, it is only available in one out of roughly 50 state prison facilities), so its denial is not necessarily a substantial burden, even under the Adkins definition. 393 F.3d at 570.[5] It is certainly not a denial of sustenance, as the majority at times appears to suggest. Furthermore, the majority's view ignores the consequences of its language: each prisoner's religious diet must be fully satisfied at each prison, even if there is only one such prisoner, and collateral attacks on the quality of the food itself will surely follow. Indeed, Moussazadeh has asserted that the kosher food, even the kind from the prison kitchen, is not of acceptable quality.

B.

The majority's "compelling interest" analysis is misguided for at least three reasons.

---

[5] I recognize that Baranowski v. Hart, which I address infra herein, observed that not providing kosher food "may be deemed to work a substantial burden" on an inmate's faith. 486 F.3d 112, 125 (5th Cir. 2007) (emphasis added). The majority in Moussazadeh, however, chose not to adopt such language in its discussion of substantial burden and, instead said the substantial burden inquiry was one of first impression since it involved charging inmates for kosher meals. By not adhering to Baranowski's substantial burden language, the majority opinion raised the questions I outline above.

1.

In addressing the remedy, the costs and the consequences of accommodating inmates, we should not be blind to the misuse of RLUIPA in the prison setting. Recent commentators have noted that RLUIPA imposes significant costs on prisons and that "[t]hese burdens are more onerous than Congress intended when passing the statute and more severe than federal courts initially appreciated." Taylor G. Stout, The Costs of Religious Accommodation in Prisons, 96 VA. L. REV. 1201 (2010). For example, with regard to burdens on security, "inmates' claims of religious status for their groups and religious motivations for their activities [are] significantly hinder[ing] prison officials' efforts to crack down on gang activity," id. at 1210, as gangs are adopting religious postures to mask their illegal doings. Prisons also assert that RLUIPA accommodations "permit inmates to enter sensitive areas of prison facilities," "threaten security by requiring potentially dangerous religious paraphernalia," and "send[] a message of favoritism when religious inmates obtain benefits unavailable to their secular peers." Id. at 1211, 1214; see also, Andreola v. Wisconsin, 211 F. App'x 495 (7th Cir. 2006); Fowler v. Crawford, 534 F.3d 942 (8th Cir. 2008); Hovenaar v. Lazaroff, 422 F.3d 366 (6th Cir. 2005). Security, however, is not the only source of concern. As footnote 2, supra, implies, RLUIPA can be an "administrative morass" that unnecessarily deprives prison officials of valuable time and effort. Cf. Lovelace v. Lee, 472 F.3d 174, 215 (Wilkinson, J., concurring in part and dissenting in part) (4th Cir. 2006) ("[T]o require policies to accommodate every set of individual circumstances . . . creates an administrative morass . . . ."). Finally, the financial cost of accommodations and the concomitant litigation that inevitably ensues from the denial of a select few are substantial. See Stout, 96 VA. L. REV. at 1218-24.

The majority steps around these legitimate state concerns in

Moussazadeh's case, saying that TDCJ has not provided enough evidence of security concerns, Moussazadeh, 703 F.3d at 794, and calling the cost of providing, supposedly for each Jewish prisoner, kosher kitchen food "minimal." Id. at 795. But it is difficult to imagine what additional evidence the state could put forth to demonstrate the legitimacy of its security concern. After all, the state's interest is in preventing violence, and a prison's firsthand experience of inmate behavior may lead to a subjective determination regarding the threat of future violence over food that defies "proof" in the form of studies or documentation of any sort. Arguably, then, by requiring a higher evidentiary showing, the majority is requiring empirical evidence such as an actual outbreak of violence before it will cede that a prison's security concern is "legitimate." This is troubling, notwithstanding the fact that such outbreaks have and are occurring, and thus should not escape judicial notice. "Mississippi Prison on Lockdown After Guard Dies," THE NEW YORK TIMES, May 22, 2012; "The Pecos Insurrection," THE TEXAS OBSERVER, October 8, 2009 (noting that food served at the prison was one of the causes of the uprising).

With regard to the potential financial burden on TDCJ, the majority focuses on Moussazadeh's individual case rather than the aggregate expenditures of the future resulting from the rights and complaints relating to food. This failure is no less troubling than the majority's handling of the security concern: "Exempting a solitary prisoner from a general prison policy by itself might be a manageable [financial] burden. In the aggregate, however, implementing a large number of accommodations may prove overwhelming . . . ." Stout, 96 VA. L. REV. at 1222.

2.

Cutter v. Wilkinson should guide our compelling interest analysis. 544 U.S. at 709. In that case, state prisoners sued prison officials for failing to

accommodate their religious exercise of "non-traditional" sects like the Satanist, Wicca, and Asatru religions. Specifically, the inmates alleged that Ohio prison officials violated RLUIPA by "retaliating and discriminating against them for exercising their non-traditional faiths, denying them access to religious literature, [and] denying them the same opportunities for group worship that are granted to adherents of mainstream religions . . . ." Id. at 713. On its way to ultimately rejecting the inmates' claims, the Supreme Court stated that "We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety. Our decisions indicate than an accommodation must be measured so that it does not override other significant interests." Id. at 721 (emphasis added). Importantly, the Court further stated explicitly that "prison security is a compelling state interest, and [] deference is due to institutional officials' expertise in this area." Id. at 725 n.13.; see also, id. at 723 (RLUIPA's Senate sponsors expressed their belief that courts would apply RLUIPA with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."). Finally, in Cutter, the Supreme Court noted its expectation that lower courts would apply RLUIPA with "particular sensitivity" to security concerns. Id. at 722 (emphasis added). As Judge Barksdale's thorough dissent points out, the majority seems to have cast Cutter to the wind. Moussazadeh, 703 F.3d at 798-99 (Barksdale, J. dissenting). Its attempt to distinguish Cutter rests on an unsupported assumption that the Supreme Court was "only" concerned with the Establishment Clause and a specific type of religious accommodation, but not with the broad implications of cases like Moussazadeh's.

Since Cutter, various other circuits have found, in non-binding but nonetheless persuasive opinions, that the administrative and financial burdens

imposed on prisons by RLUIPA outweigh the substantial burdens on inmates' religious exercise in certain circumstances. See Smith v. Kyler, 295 F. App'x 479 (3d Cir. 2008) (prison's not being able to afford to hire a chaplain for every religion that might be represented in the prison population is not a violation of RLUIPA); Andreola, 211 F. App'x 495 (under RLUIPA, prison is not required to permit an inmate to supervise the preparation of his meals or to spend additional money to provide him with prepackaged kosher meals); Fowler, 534 F.3d 942 (prison is not required to construct sweat lodge to accommodate a Native American inmate's religious ceremony); Linehan v. Crosby, 346 F. App'x 471 (11th Cir. 2009) (controlling costs is a compelling government interest and serving vegan, rather than kosher, was the least restrictive means). These opinions merit our consideration.

3.

As noted above, Baranowski explicitly held the following: a prison's failure to provide kosher food is "related to maintaining good order and controlling costs and, as such, involves compelling governmental interests." 486 F.3d at 125. That holding regarding "compelling interest" should have decided Moussazadeh's case.

C.

Judge Barksdale's dissent points out that the least restrictive means standard is referred to as "fatal in fact" because it leads to the challenged government policy being struck down. There is nothing to suggest that here, when the majority declined to follow the Baranowski least restrictive means approach (which expressly incorporated Cutter's deference to prisons, see 486 F.3d at 125-26), the post-remand result will be any different. Indeed, the "majority's remand must be seen for precisely what it is: "an invitation to [further] finetune prison policy from the judicial perch." Lovelace, 472 F.3d at

205 (Wilkinson, J., concurring in part and dissenting in part).  It seems a hollow truth with which the opinion concludes: "We do not suggest how the district court should proceed or what decisions should be reached in light of the guidance set forth in this opinion."  Moussazadeh, 703 F.3d at 796.  Nevertheless, the panel is entitled to have its intentions respected: the district court must feel free to decide the case as it determines is appropriate under the controlling law; and the controlling law is Baranowski.

V.

For the reasons stated above, I feel the panel majority in this case has ignored the directive that "context matters" in religious accommodation cases, disregarded Baranowski, and misapplied the three prongs of the RLUIPA substantial burden test.  Because these represent grave errors that merit reconsideration, I respectfully dissent from the court's denial of rehearing en banc.