# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 30, 2008

Charles R. Fulbruge III
Clerk

No. 06-50490

DARREN L MAYFIELD

Plaintiff - Appellant

v.

TEXAS DEPARTMENT OF CRIMINAL JUSTICE; GARY L JOHNSON, EXECUTIVE DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION, sued in individual and official capacity; BILL PIERCE, Director of Chaplaincy, sued in individual and official capacity

Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas

Before GARWOOD, GARZA, and BENAVIDES, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Darren L. Mayfield ("Mayfield"), Texas prisoner #571949, appeals the district court's grant of summary judgment in favor of the defendants on his claims alleging First Amendment violations under 42 U.S.C. § 1983 as well as violations of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc-2000cc-5. For the following reasons we affirm in part, vacate in part, and reverse in part the district court's judgment and remand.

I

Mayfield, a prisoner incarcerated in the Texas Department of Criminal Justice ("TDCJ") Hughes Unit, practices the Odinist/Asatru faith. He describes Odinism as the ancestral folk religion of Northern Europe and a polytheistic, nature-based faith that worships a variety of gods and goddesses. The practice of Odinism involves group worship meetings known as Blotar. A Blotar ceremony requires the use of certain religious paraphernalia including runestones, a blessing bowl, a non-alcoholic beverage, a drinking horn, an altar cloth, a symbolic Thor's hammer made of material such as cardboard, and a leafed evergreen branch. Runestones are small tiles made from pieces of antler, wood, or stone that have been carved with characters of the ancient runic alphabet inscribed on them. Aside from having runestones for the Blotar ceremony, Odinism also involves the individual study of runestones. The individual study of runestones is an essential component of the Odinist faith because the stones serve as meditation tools to reveal wisdom and truth to the practitioner. Hughes Unit inmates designating their faith preference as Odinism are relatively few. Just 41 out of the 2,869 inmates confined in the Hughes Unit designated their faith preference as Odinist/Asatru. Only 21 of the designated Odinists regularly participate in the Odinist religious ceremonies.

According to the affidavits of various Odinist leaders outside the prison, Blotar should be conducted, at a minimum, on a monthly basis. Odinists in the Hughes Unit are unable to conduct their Blotar on a regular basis because the TDCJ requires that they have a security-trained, religious volunteer present for their group meetings.[1] The only approved outside volunteer lives in Arkansas and could not come to the Hughes Unit as frequently as Mayfield and the other

---

[1] TDCJ policy states that some form of security is required for religious group meetings, either in the form of a trained volunteer from outside the prison, a prison chaplain, or other TDCJ security personnel.

Odinists desired.[2]  Mayfield asked prison authorities for permission to hold Odinist group meetings with prison security present rather than an outside volunteer.  The TDCJ denied this request on a number of occasions, noting that security and space considerations prevented the Odinists from meeting without an outside volunteer.   Also, despite repeated requests to personally possess runestones, the TDCJ did not allow the Odinists access to runestones except for when the trained volunteer brought them into the prison.[3]   The TDCJ determined that runestones presented distinct security issues because they could be used for gambling, as gang identifiers, or for secret communication between inmates.

After exhausting his administrative remedies, Mayfield brought this suit against the TDCJ and against Gary Johnson ("Johnson") and Bill Pierce ("Pierce") in their individual and official capacities.[4]  His suit claims that the defendants placed impermissible burdens on the Odinist adherents at the Hughes Unit by allowing them to meet only when an approved outside volunteer could visit the prison, by prohibiting the Odinist adherents from personally possessing runestones, and by prohibiting access to literature on the runes. Mayfield brought suit under § 1983, alleging a violation of his First Amendment right to free exercise of religion.  Mayfield also claimed that the TDCJ's practices violated RLUIPA, which protects the religious practices of institutionalized persons.

---

[2] The summary judgment record does not clearly reflect how often the Odinist volunteer could come to the prison.  See Part II.D.1, infra.

[3] TDCJ has, since the filing of Mayfield's suit, stated its intention to institute a pilot program that would allow prisoners to purchase their own set of approved runestones.  Under the pilot program the runestones are to be kept in the custody of the unit chaplain and checked out to inmates for use during approved time slots.  However, according to the evidence submitted, the pilot program has not yet been implemented.

[4] When necessary, we distinguish between the TDCJ and the individual defendants in this case. See Part II.A, infra.  However, because Mayfield brings the same claims against all of the defendants, for simplicity's sake the opinion often refers to the defendants collectively as "TDCJ."

The district court granted summary judgment in favor of the defendants on all of Mayfield's claims. The court provided a number of grounds for its summary judgment dismissal. First, the district court concluded that the defendants were entitled to judgment as a matter of law because Mayfield had not sufficiently shown a violation of either RLUIPA or the First Amendment. However, the district court also proceeded to consider the impact of sovereign and qualified immunity on Mayfield's claims. The district court held that both sovereign and qualified immunity prevented Mayfield from pursuing his claims. Finally, the district court determined that Mayfield had failed to state claim for relief) ) because he was a prisoner proceeding pro se and in forma pauperis the district court imposed a strike against him under the three-strikes provision found in 28 U.S.C. § 1915(g).[5] Mayfield filed a timely notice of appeal and counsel was eventually appointed on appeal.

II

We review the district court's grant of summary judgment de novo, applying the same standard as did the district court. See Baranowski v. Hart, 486 F.3d 112, 119 (5th Cir. 2007). Summary judgment is appropriate "if the pleadings, depositions, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the burden to "demonstrate the absence of a genuine issue of material fact." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (internal quotation marks and citation omitted).

---

[5] 28 U.S.C. § 1915(g) states:
In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

In making our determination, we must resolve disputed facts in favor of the nonmoving party, in this case Mayfield. See id.

In reviewing the district court's grant of summary judgment, we address each of its grounds for granting the summary judgment dismissal. First, we consider the district court's conclusions as to sovereign and qualified immunity. Concluding that complete dismissal of Mayfield's claims was improper on immunity grounds alone, we then proceed to analyze whether issues of fact remain.

## A

In reaching its conclusion as to the application of sovereign immunity, the district court held that all of Mayfield's claims against the TDCJ and the employees of the TDCJ charged in their official capacities were barred by the Eleventh Amendment. As to Mayfield's claims for damages against Johnson and Pierce in their individual capacities, the district court held that the two defendants were entitled to qualified immunity.

The district court dismissed all claims against the TDCJ on sovereign immunity grounds. The TDCJ is an agency of the state, and as such is normally shielded from "suits by individuals absent [its] consent." Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004). Mayfield does not challenge the district court's dismissal of his claims against the TDCJ, and therefore has waived any contention that these claims should survive the district court's judgment.[6] See Longoria v. Dretke, 507 F.3d 898 (5th Cir. 2007) (holding that prisoner waived First Amendment claim because he failed to brief arguments on appeal).

---

[6] We note that some circuit courts have addressed the question of whether RLUIPA constitutes a waiver of sovereign immunity, thus making states amenable to suit. See note 8, infra. However, the district court does not appear to have considered the argument and it was not briefed before us. Therefore, we do not address it. See In re Dearborn Marine Service, Inc., 499 F.2d 263, 270 n. 12 (5th Cir. 1974) (refusing to consider an argument that presented an issue of law novel in the circuit because it was not briefed by the parties).

Still, sovereign immunity is subject to an established exception when it comes to the ability of state officers to invoke its protections. "Under Ex Parte Young, a federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law." McCarthy ex rel. Travis v. Hawkins, 381 F.3d 407, 412 (5th Cir. 2004); see also Frew, 540 U.S. at 437 (noting that Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law). Construing Mayfield's pro se complaint liberally, we find that it seeks declaratory relief as well as a permanent injunction against Johnson and Pierce in their official capacities. See Nerren v. Livingston Police Dep't, 86 F.3d 469, 473 (5th Cir. 1996) (recognizing that we construe pro se complaints liberally); Aguilar v. Tx. Dep't Criminal Justice, 160 F.3d 1052, 1054 (5th Cir. 1998) (explaining that the application of Ex Parte Young requires the complaint to include claims against individual persons in their official capacities as agents of the state, and the "relief sought must be declaratory or injunctive in nature and prospective in effect"). Mayfield's amended complaint and attached memorandum state that he seeks for the court to "declare the acts and omissions described herein violated the Plaintiff's . . . rights under the Constitution and laws of the United States," and also that he "seeks a permanent injunction. . . as to his claims." Both § 1983 and RLUIPA allow for declaratory and injunctive relief.[7] As such, the district court erred in concluding that "Plaintiff's claims are all covered with immunity from the Eleventh Amendment." Mayfield's claims for declaratory and injunctive relief against Johnson and Pierce in their official capacity are not barred by sovereign immunity.

---

[7] See 42 U.S.C. § 1983 (stating that a defendant may be liable "in an action at law, suit in equity, or other proper proceeding for redress"). RLUIPA also provides for such relief against state government officials. See 42 U.S.C. § 2000cc-2 (noting that RLUIPA provides for "appropriate relief against a government"); 42 U.S.C. § 2000cc-5 (defining "government" to include an "official" of "a State . . . or other governmental entity created under the authority of a State").

To the extent that Mayfield seeks damages against Johnson and Pierce, we need not address the district court's conclusions that sovereign and qualified immunity prevent Mayfield's recovery.[8]  Instead, we affirm the grant of summary judgment to the extent that Mayfield seeks damages because his damage claims are barred by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(e).  See Brewer v. Wilkinson, 3 F.3d 816, 820 (5th Cir. 1993) (noting that in affirming a district court's grant of summary judgment, we are not bound by the reasons articulated by the district court).  The PLRA provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e). We have held that the application of this provision turns on the relief sought by a prisoner, and that it prevents prisoners from seeking compensatory damages for violations of federal law where no physical injury is alleged.  See Geiger v. Jowers, 404 F.3d 371, 375 (5th Cir. 2005) (per curiam).  Despite the limitations imposed by § 1997e(e), we have recognized that a prisoner can, absent a showing of physical injury, pursue punitive or nominal damages based upon a violation of his constitutional rights.  See Hutchins v. McDaniels, 512 F.3d 193, 197-98 (5th Cir. 2007) (per curiam).  However, Mayfield has not

---

[8] Mayfield seeks compensatory damages from the TDCJ, as well as Johnson and Pierce in both their official and individual capacities.  The rule is commonly stated that, "[f]ederal courts may not award retrospective relief, for instance, money damages or its equivalent, if the State invokes its immunity."  Frew, 540 U.S. at 437.  This rule normally applies to states, as well as state officers acting in their official capacity, and would prevent Mayfield from seeking such damages under § 1983.  See Quern v. Jordan, 440 U.S. 332, 345 (1979) (recognizing that § 1983 does not indicate "an intent [by Congress] to sweep away the immunity of the States").  However, circuit courts are currently split on whether RLUIPA provides for a waiver of state sovereign immunity.  See Madison v. Virginia, 474 F.3d 118, 131 (4th Cir. 2006) (finding that RLUIPA does not constitute a waiver of immunity allowing for damages actions); Benning v. Georgia, 391 F.3d 1299, 1305-06 (11th Cir. 2004) (finding that § 3 of RLUIPA constitutes a waiver of state sovereign immunity); see also Smith v. Allen, 502 F.3d 1255, 1269-76, and 1276 n. 12 (11th Cir. 2007) (holding that a prisoner can, under RLUIPA, pursue nominal damages against a state officer in her official capacity).  Whether RLUIPA contemplates damages actions against officers in their individual capacity has also created disagreements amongst courts. See Madison, 474 F.3d at 130 n. 3 (listing cases).  We need not reach these issues to decide this appeal.

alleged any physical injury and his complaint seeks only compensatory damages. As such, Mayfield's claims for damages are barred by § 1997e(e). See Geiger 404 F.3d at 375 (applying §1997e(e) to bar prisoner's claim for damages brought under § 1983 alleging a First Amendment violation); RLUIPA, 42 U.S.C. § 2000cc-2(e) ("Nothing in this chapter shall be construed to amend or repeal the Prison Litigation Reform Act of 1995 (including provisions of law amended by that Act)."); Cutter v. Wilkinson, 544 U.S. 709, 723 (2005) (noting that RLUIPA claims are subject to the exhaustion requirement of § 1997e(a)); see also Smith v. Allen, 502 F.3d 1255, 1271 (11th Cir. 2007) (recognizing that damage claims under RLUIPA are limited by § 1997e(e)).

Neither sovereign nor qualified immunity prevent Mayfield from pursuing declaratory and injunctive relief against the state officials in this case. The district court's grant of summary judgment cannot rest on immunity grounds alone. Therefore, we proceed to consider the district court's conclusion that summary judgment was proper because no issues of fact existed as to Mayfield's claims under § 1983 and RLUIPA.

B

Mayfield submitted a number of affidavits from Odinist leaders along with his motions and responses filed in the district court. The affidavits explain the basic tenets of Odinism, expressing the affiants' understandings of the importance of certain ritual items and practices to the Odinist faith. Some of the affiants draw conclusions as to the likely security threat posed by the Odinists's group meetings or possession of runestones. The defendants moved to strike the affidavits in their entirety, arguing that none of the affiants have sufficient knowledge, skill, experience, training, or education to qualify as experts in prison security under FED. R. EVID. 702. The district court did not rule on the motion at that time. However, in its order dismissing Mayfield's claims on summary judgment, the district court made an ambiguous ruling as to the

admissibility of these affidavits. After quoting heavily from the affidavits of TDCJ personnel, the district court turned to the affidavits from Odinist leaders submitted by Mayfield. The district court agreed with the defendants' arguments from its prior motion and found that the affiants were unqualified to testify as experts in the area of prison security. As to this particular ruling, which we review for an abuse of discretion, we do not disagree. See Boyd v. State Farm Ins. Cos., 158 F.3d 326, 331 (5th Cir. 1998) (noting the broad discretion afforded to district courts in ruling on the admissibility of expert testimony in the summary judgment context). Mayfield submitted no evidence that would establish any of his affiants as experts in the field of prison security measures.

However, some question remains as to the district court's ruling concerning the remaining portions of the affidavits: those that do not draw conclusions as to security but instead explain certain Odinist practices. In its fiat, the district court noted that all outstanding motions not previously ruled upon were denied. On appeal, the defendants repeat the argument raised below that Mayfield's affiants are not qualified to testify as to the wisdom of prison security policy. The district court agreed with this argument and so do we. However, because the district court's reasons for excluding testimony of Mayfield's affiants apply only to the affiants' opinions regarding prison security, and because the court through its fiat denied the defendants' motion to strike the affidavits in their entirety, we treat those portions of the affidavits not related to prison security as part of the summary judgment record. See Akin v. Q-L Investments, Inc., 959 F.2d 521, 531 (5th Cir. 1992) ("On a motion for summary judgment the district court should disregard only those portions of an affidavit that are inadequate and consider the rest."); 10B CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2738, 375-76 (3d Ed. 1998) (collecting cases in support of this proposition).

C

First, we consider Mayfield's § 1983 claim that the TDCJ violated his First Amendment right to free exercise. We review prison regulations that encroach on fundamental constitutional rights under the standard set forth by the Supreme Court in Turner v. Safley, 482 U.S. 78 (1987), to determine whether the regulation is "reasonably related to legitimate penological interests." Id. at 89; see O'Lone v. Estate of Shabazz, 482 U.S. 342, 349-53 (1987) (applying Turner's standard to free exercise claim brought by prisoner under § 1983). In evaluating the reasonableness of a prison regulation, Turner instructs us to consider four factors: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation . . . will have on guards and other inmates, and on the allocation of prison resources generally"; (4) whether there are "ready alternatives that could fully accommodate[] the prisoner's rights at de minimis cost to valid penological interests." Turner 482 U.S. at 89-91 (internal citations and quotation marks omitted). Turner's standard also includes a neutrality requirement))"the government objective must be a legitimate and neutral one . . . [and] [w]e have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion." Id. at 90; see Freeman v. Texas Dep't of Criminal Justice, 369 F.3d 854, 860-61 (5th Cir. 2004) ("Foremost, TDCJ's regulation is neutral. . . . There is no evidence that TDCJ's policy is targeted toward the Church of Christ, or favors one religious group over another." (internal quotation marks and citations omitted)). While Turner's standard encompasses four factors, we have noted that rationality is the controlling factor, and a court need not weigh each factor equally. See Scott v. Miss. Dep't of Corr., 961 F.2d 77, 81 (5th Cir. 1992).

Mayfield claims that his free exercise rights were improperly limited in two ways: (1) the TDCJ's not allowing the Odinist group to assemble for religious services in the absence of an outside volunteer (the "volunteer policy"); and (2) the TDCJ's preventing the Odinists from personally possessing runestones and accessing rune literature (the "runestones policy").[9] The district court concluded that no material issues of fact remained as to either claim. We consider each claim under Turner's standard, analyzing whether the record, when interpreted in a light most favorable to Mayfield, reveals a genuine issue of material fact that precludes summary judgment.

1

We have analyzed the TDCJ's volunteer policy under Turner's standard in the past and upheld the policy on each occasion. See Baranowski, 486 F.3d at 121-22; Adkins v. Kaspar, 393 F.3d 559, 565 (5th Cir. 2004). Applying Turner's four factors to the TDCJ's outside-volunteer policy in this case, we first note that the policy itself is reasonably related to a legitimate penological interest. The TDCJ's asserted justifications for the volunteer requirement involve prison security concerns, as well as staff and space limitations. These are valid penological interests. We have recognized in previous cases that the TDCJ's volunteer requirement is rationally related to these legitimate concerns. See Baranowski, 486 F.3d at 121 (affirming a district court's grant of summary judgment, in part, because "[t]he record demonstrates that the prison policies at issue here are logically connected to legitimate penological concerns of security,

---

[9] Mayfield also complains that the TDCJ does not allow the Odinists to store at the prison the religious paraphernalia associated with the Blotar, whereas TDCJ allows other faiths to store religious items in the chapel. The TDCJ determined that the Odinist volunteer must bring and take away the Blotar items with each visit. We do not see this claim as distinct from Mayfield's claim to hold religious meetings without a volunteer present. The absence of the Blotar items in the chapel does not impose a distinct burden on Mayfield's religious practice unless the Odinists can meet without a volunteer. Until the TDCJ's denial of group meetings is deemed unlawful, a decision that we do not make here, the TDCJ's decision not to store the Blotar items in the prison chapel need not be evaluated separately.

staff and space limitations"). However, in this case, the summary judgment record reveals a factual dispute as to the neutrality of the policy's application. In prior cases where we have affirmed summary judgment on similar § 1983 claims, we have relied on the neutrality of the prison's policy in doing so. See Adkins 393 F.3d at 571 (noting that, "[t]he requirement of an outside volunteer . . . is a uniform requirement. . . ."); Freeman, 369 F.3d at 860 ("Foremost, TDCJ's regulation is neutral . . . ."); Green v. Polunsky, 229 F.3d 486, 490 (5th Cir. 2000) (finding that a prison policy requiring short hair and clean-shaven faces does not violate inmates' right to free exercise, in part because the "the policy is neutral, affecting all inmates, regardless of their religious beliefs"); Mumin v. Phelps, 857 F.2d 1055, 1057 (5th Cir. 1988) (noting that, "there is not a shred of evidence that the appellants are being denied any rights because they are Muslims"). The TDCJ submitted evidence that its volunteer requirement is imposed uniformly, with an exception for Muslims based on an earlier court order. Mayfield submitted affidavit testimony from two prisoners, one a Muslim and one a practitioner of Native American religion. Both averred that their religious groups are allowed to hold regular meetings without an outside volunteer. The Native American affiant stated that such meetings were held on a near-weekly basis. Mayfield contends that the TDCJ is intentionally targeting the Odinists through the disparate application of its volunteer policy. While the TDCJ states in its appellate brief that "Native Americans are also required to have a volunteer present," no record evidence supports this statement. In an attempt to resolve this dispute, the district court reached a factual conclusion unsupported by the summary judgment record. The district court concluded that Mayfield's evidence of the policy's disparate application could be overlooked because, "Muslim, Christian, and Native American groups are not similarly situated [to Odinists] in that they have a far greater number of adherents both inside and outside the prison." While the summary judgment record supports

the conclusion that Odinists are a small percentage of the Hughes Unit's population, the record does not identify the number of inmates that have designated their faith group as Islam, Christian, or Native American. We cannot overlook material issues of fact concerning the neutrality of the volunteer policy's application based on assumptions about the relative size of the Odinists compared to other faith groups within the Hughes Unit (e.g., the potentially small number of Native American religious adherents).

That issues of fact remain as to the neutrality of the application of TDCJ's volunteer policy differentiates this case from those we have previously considered. Requiring neutrality ensures that the prison's application of its policy is actually based on the justifications it purports, and not something more nefarious. Were we to ignore Turner's neutrality requirement, we would allow prison regulators to justify a policy based on a legitimate interest applicable to the overall prison population, while applying the policy in an arbitrary or discriminatory manner in violation of a particular subgroup's First Amendment rights. Cf. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 534 (1993) ("Facial neutrality is not determinative. . . . The [Free Exercise] Clause forbids subtle departures from neutrality and covert suppression of particular religious beliefs." (internal quotation marks and citations omitted)). In reaching this conclusion we do not suggest that "every religious sect or group within a prison - however few in number - must have identical facilities or personnel." Cruz v. Beto, 405 U.S. 319, 322 n. 2 (1972). But under Turner, neutrality must be ensured, or its absence sufficiently explained in light of a legitimate penologoical interest, for summary judgment to be appropriate. See Thornburgh v. Abbot, 490 U.S. 401, 415-16 (1989) (holding that Turner's neutrality requirement allows a prison policy to draw distinctions so long as those distinctions flow from the government's legitimate penological interest); see also Hammer v. Ashcroft, 512 F.3d 961, 968-69 (7th Cir. 2008) (holding that

issue of material fact as to neutrality in application of prison regulation required reversal of district court's grant of summary judgment); Dingle v. Zorn, 189 F. App'x 8, 10 (2d. Cir. 2006) (unpublished) (reversing summary judgment because issue of facts existed as to neutrality in prison's application of religious volunteer policy).

Turner's second element requires consideration of the alternative means of worship available in spite of the prison regulation. "The pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith." Freeman, 369 F.3d at 861. In other words, we ask "whether the regulation entirely stifles the prisoner's religious expression." Scott, 961 F.2d at 81. The TDCJ notes that Mayfield may gather for group worship when an outside volunteer is present, and may worship individually in his cell with items approved for personal possession. The TDCJ's policy also allows Mayfield the opportunity to meet individually with an approved spiritual advisor twice monthly. The TDCJ submitted evidence that Mayfield has access to Odinist religious materials in the unit's spiritual library. Klaus Adams, the Hughes Unit chaplain, averred that he banned a single book related to Odinism, but that many Odinist prisoners use the spiritual library. Mayfield responds that personal worship in his cell is made impossible because the TDCJ does not provide any of the necessary items for Odinist religious practice, and that Odinism is, by its nature, a religion of communal worship. Mayfield also submits evidence showing that the Hughes Unit refused to approve a number of books on Odinism, specifically books related to runes. While the record presents minor unresolved issues of fact regarding alternative means available to Mayfield, these issues of fact are not material and the record sufficiently establishes that Mayfield has access to alternative means of worship.

As to Taylor's third prong, we recognize the heavy burden on guards, other inmates, and prison resources that could result from requiring the TDCJ to accommodate the Odinists' request. Allowing the Odinists to meet without a volunteer would require the TDCJ to pull an officer from other necessary security duty in order to monitor the religious service. The Odinists are a small group, a mere 1.4% of the Hughes Unit's inmate population. If all 140 religious groups in the TDCJ requested the ability to meet without an outside volunteer, prison security could be seriously compromised by the need to remove personnel from their usual security posts.

Finally, other than the request to allow the Odinists to meet without an outside volunteer, Mayfield presents no other alternative means of accommodation. The above paragraph indicates the strain that this particular accommodation could impose on prison security. This potential strain represents more than a de minimis cost to TDCJ's valid penological interest in maintaining security. However, the record leaves us to question why the Native American religious group can meet without imposing more than a de minimis cost to TDCJ's interests, but the Odinists cannot.

We note again that the religious accommodation policy is facially neutral. We also recognize the burden that the TDCJ may face if it is required to accommodate every request from religious groups of equivalent size to the Hughes Unit's Odinist population. And while Turner provides a deferential standard, see O'Lone, 482 U.S. at 350 (noting the respect and deference that the Constitution provides for the judgment of prison administrators), it does not mandate summary judgment in favor of prison regulators in all cases. See Thornburgh, 490 U.S. at 414 (stating that Turner's "reasonableness standard is not toothless."). Because of the importance of neutrality to our First Amendment analysis, and because the record reveals disputed issues of fact concerning the neutrality of TDCJ's application of its volunteer policy, summary judgment was

inappropriate on Mayfield's First Amendment claim concerning the volunteer policy.

2

Mayfield also contends that the TDCJ violates his free-exercise rights by preventing his personal possession of runestones, and barring access to literature about runes. Again, we consider the TDCJ's action under Taylor's four-pronged analysis. First, we consider whether the regulation is rationally related to a legitimate penological interest, also considering the neutrality of the regulation. As noted above, the TDCJ determined that personal possession of the small tiles would not be allowed for a number of reasons. The TDCJ does not allow personal possession of any type of playing card, dice, or tarot cards, as these items can be used for gambling, trafficking and trading. Gambling creates a debtor-type relationship among inmates that could then lead to violence when prisoners are unable to repay debts. Thus, items with a specific connection to gambling pose a unique security risk. Because of similarities between the runestones and these gambling-related items, the TDCJ refused to allow the Odinists to personally possess the stones. Further, the TDCJ determined that the runestones, because of their ancient script and small size, provide an opportunity for inmates to secretly pass information. The TDCJ also found that the runestones could be used to identify gang members, circumventing TDCJ's attempts to monitor and control gang activity.

Mayfield argues that the TDCJ's reasons for prohibiting runestones are not rational because the TDCJ is incorrect in its identification of the potential dangers associated with runestones)) Mayfield claims that runestones are more like scrabble tiles or checkers which the TDCJ allows inmates to possess in certain circumstances. However, issues of prison security are "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence. . . that the officials have exaggerated their

response to these considerations, courts should ordinarily defer to their expert judgment in such matters." Pell v. Procunier, 417 U.S. 817, 827 (1974). Recognizing the deference owed to the judgment of prison officials, we find that the TDCJ's fears regarding security represent legitimate penological interests and that the TDCJ's preventing personal possession of runestones is rationally related to that interest.

Mayfield also claims that Odinist inmates are treated differently because other faiths have access to religious scripts and other religious paraphernalia. In contrast to the volunteer policy, Mayfield submits no evidence to call into question the neutrality of the TDCJ's decision as to runestones. There is no neutrality problem because Mayfield presents no evidence that other religious groups in the Hughes Unit have access to religious paraphernalia presenting similar security risks. Mayfield submitted evidence that Islamic inmates can personally possess a prayer rug, a Kufi cap, and prayer beads. However, Mayfield has not shown that these items present the distinct problems posed by personal possession of runestones.

As to the second element of Turner's rationality analysis, undisputed portions of the summary judgment record show that Mayfield has sufficient alternative means of worship available. See Scott, 961 F.2d at 81 (asking whether the regulation "entirely stifles" the inmate's religious exercise). Any disputed issues of fact regarding Mayfield's access to alternative means of worship do not rise to the level of materiality, as they do not provide a trier of fact with a basis for finding that the TDCJ's stance on possession of runestones is not rationally related to the TDCJ's legitimate penological interest in maintaining security. See Wyatt v. Hunt Plywood Co., 297 F.3d 405, 409 (5th Cir. 2002) (noting that an issue of fact is material only "if its resolution could affect the outcome of the action").

Considering prongs three and four of Turner's standard, we recognize that accommodating Mayfield's request for runestones would impose a burden on the TDCJ's security personnel. Based on the security problems identified by the TDCJ, the Hughes Unit's security personnel would face new risks from potential gambling and gang-related dangers. Also, allowing the Odinists to possess items similar to those disallowed to other inmates "could have a negative effect on prison morale and discipline." Adkins, 393 F.3d at 565. Again, there is no evidence of ready alternatives that would fully accommodate Mayfield's request at a de minimis cost to the TDCJ's interest in preserving security. Based on the foregoing analysis, we agree with the district court's conclusion that the TDCJ is entitled to summary judgment on Mayfield's § 1983 claim concerning personal possession of runestones.

The district court, treating all of Mayfield's claims together under the First Amendment, stated that "the summary judgment evidence clearly shows that the restrictions experienced by Plaintiff are based upon staffing, as well as safety, security, and operational concerns, all of which are valid penological interests." However, none of the penological interests provided by the TDCJ necessarily support limiting access to rune literature in the prison library. The TDCJ's summary judgment evidence focuses on the dangers associated with allowing inmates to possess runestones. Specifically, TDCJ relies on the dangers created by the stones' small size, ancient script, and similarity to gambling paraphernalia. These dangers associated with possession of runestones are not necessarily present when an inmate simply seeks to study books on runes in the prison library. As noted above, the record does not clearly present what Odinist literature is available in the prison library, or whether literature on runes is available at all. In his affidavit, Klaus Adams testified that Odinist literature is available and that he removes books from the library which he deems to be "inappropriate," including "pornography and material which defames other

18

faiths." Mayfield averred that rune literature is banned and submitted evidence showing a number of rune-related books denied by the library. Based on the summary judgment record, we cannot determine the extent to which the TDCJ allows or disallows the Odinists to access rune-related literature. Moreover, the record does not include reference to a penological interest that would justify limiting access to rune literature in the prison library. The district court's general First Amendment conclusion does not address this lack of evidence. See Turner, 482 U.S. at 89 (stating that defendants must "put forward" a legitimate penological interest). Because the record does not provide the necessary support for the district court's conclusion as to rune literature, which it reached as a matter of law, the district court improperly resolved this issue on summary judgment. On remand, the district court should examine the extent to which any actual limitation on rune literature constitutes a violation Mayfield's free-exercise rights.

D

Mayfield relies on the same factual predicate underlying his § 1983 claims to bring RLUIPA claims. RLUIPA imposes a higher burden than does the First Amendment in that the statute requires prison regulators to put forth a stronger justification for regulations that impinge on the religious practices of prison inmates. Under RLUIPA:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person))
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Under RLUIPA we first ask whether the challenged government action "substantially burdens" the plaintiff's "religious exercise."

This normally requires two separate assessments, first whether the burdened activity is "religious exercise," and second whether that burden is "substantial." See Adkins, 393 F.3d at 567. The defendants have not raised any challenge as to whether the actions Mayfield claims are burdened qualify as "religious exercise" under RLUIPA. Therefore, we begin our analysis with the substantial burden question. The prisoner bears the burden to establish the existence of a substantial burden. 42 U.S.C. § 2000cc-2(b). RLUIPA does not define what constitutes a "substantial burden." In Adkins, we defined the term as follows:

> [A] government action or regulation creates a "substantial burden" on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs . . . . [T]he effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs.

Adkins, 393 F.3d at 570. We noted that the definition, "requires a case-by-case, fact-specific inquiry to determine whether the government action or regulation in question imposes a substantial burden." Id. at 571. If the prisoner presents prima facie evidence of a substantial burden, the government is required to demonstrate that its action was supported by a compelling interest and that the regulation is the least restrictive means of carrying out that interest. See 42 U.S.C. § 2000cc-2(b). Again, we consider both (1) the prison's limitation on Odinist group assembly and (2) the prison's limitation on Mayfield's possession of runestones and access to rune literature.

1

As to Mayfield's claim concerning TDCJ's outside volunteer requirement, the district court concluded that Mayfield failed to show a substantial burden

upon the exercise of his faith and therefore failed to state a claim under RLUIPA. The district court also found the prison's application of its policy based upon a compelling governmental interest in maintaining a safe, secure, and efficient prison.

The district court relied heavily on our Adkins decision to dismiss Mayfield's claim under RLUIPA. Adkins dealt with members of the Yahweh Evangelical Assembly ("YEA") who brought claims under RLUIPA based on their inability to congregate on regular Sabbath and YEA holy days. Adkins, 393 F.3d at 571. Adkins complained of the same policy at issue here, the TDCJ's policy requiring an outside volunteer's presence for group religious meetings. Id. In Adkins, an outside volunteer was able to come to the prison once a month to conduct services. Id. at 562. Aside from group meetings, Adkins had access to religious materials, such as books, as well as video and audiotapes related to YEA religious practices. In ruling on Adkins' RLUIPA claim, we noted that the TDCJ's policy requiring an outside volunteer's presence "is a uniform requirement for all religious assemblies at Coffield [i.e., Adkins' prison]," and that the defendants could not be blamed for the "dearth of qualified outside volunteers available to go to Coffield." Id. at 571. We concluded that summary judgment was proper as to Adkins' RLUIPA claim because he had not established that the volunteer policy imposed a substantial burden on his exercise of religion.[10]

Because Adkins counsels a fact-specific, case-by-case review, we do not believe that Adkins laid down a per se rule that the TDCJ's volunteer requirement could never impose a substantial burden on a prisoner's exercise of religion. Looking to the summary judgment record in this case, we conclude that

---

[10] A panel of this court recently reached a similar holding in Baranowski, 486 F.3d at 125 (holding that the TDCJ's volunteer requirement did not impose a substantial burden on Jewish inmates who wanted to meet on more Sabbath and Jewish holy days than their volunteer could attend).

21

material issues of fact remain. Thus, the district court erred in concluding that, as a matter of law, the Hughes Unit's implementation of the policy did not result in a substantial burden on Mayfield's religious exercise.

The summary judgment record reflects a number of disputed facts pertinent to a substantial burden inquiry. First, the record is unclear as to how often the Odinists' outside volunteer could come to the prison. Mayfield and other Odinist prisoners averred that she came, at most, twice a year, but had only come twice in the last three years. Klaus Adams, the Hughes Unit Chaplain, averred that the volunteer came once every three or four months. The district court adopted Adams' contention of every three or four months, but provided no justification for its adoption of the TDCJ's evidence over Mayfield's. This fact is central to an analysis of the burden placed on Mayfield and the other Odinists who seek to gather for group worship. In Adkins, the volunteer was available for monthly meetings with anticipation that new volunteers would soon make more frequent meetings possible. See id. at 571 (noting that the court's concerns were alleviated by the likely presence of new volunteers). At the summary judgment stage we must resolve disputed facts in favor of Mayfield. Resolving the factual dispute in Mayfield's favor, the volunteer is available once every 18 months. Unlike the situation in Adkins, there is no evidence in this case that new volunteers will likely soon be available to reduce the burden on Mayfield's ability to worship in a group.

Secondly, as noted above with regard to Mayfield's § 1983 claim, a factual dispute exists as to the circumstances under which the Hughes Unit and the TDCJ allow prisoners to conduct religious services without an outside volunteer. In Adkins, we noted the uniformity of the policy's implementation at Coffield as one reason why the policy did not impose a substantial burden. See id. Because the volunteer policy was implemented uniformly in the Adkins case, it was not the policy imposing the burden on Adkins' religious practice, but instead the lack

of qualified volunteers. Id. While we recognize that Mayfield's ability to gather for group worship appears to suffer from a similar lack of volunteers, Mayfield has presented evidence which calls into question the uniformity of the policy's application at the Hughes Unit, suggesting that the burden is at least partially imposed by the TDCJ's disparate application.

Finally, we note again the disputed evidence concerning the alternatives available to the Odinists to practice their faith. In Adkins, we recognized that the YEA had access to religious literature, as well as video and audio tapes related to YEA religious practices. Id. at 564. Affidavits from Mayfield and other Odinist prisoners suggest that the Hughes Unit's Odinists do not have similar access to alternative means of worship. An inability to exercise other means of Odinist worship increases the relative burden imposed by the TDCJ's policy preventing group meetings in the absence of an outside volunteer.

We hold that these factual disputes, when resolved in Mayfield's favor, provide a reasonable basis for a finder of fact to conclude that the application of TDCJ's volunteer policy imposes a substantial burden on Mayfield's right to exercise his religion. Even assuming the district court correctly concluded that the TDCJ's policy is supported by a compelling interest in prison security and space considerations, the district court's grant of summary judgment cannot stand. The district court reached no conclusion as to RLUIPA's necessary third step: whether the TDCJ has shown the application of its policy to be narrowly tailored as a matter of law.[11] The unresolved factual issues regarding the

---

[11] In Longoria v. Dretke, 507 F.3d 898 (5th Cir. 2007) (per curiam), we affirmed a district court's dismissal of a prisoner's claim under RLUIPA despite the fact that the district court did not reach a conclusion as to whether the prison's regulation was narrowly tailored to achieve a compelling governmental interest. However, in Longoria we recognized that the TDCJ's religious grooming policy had already been evaluated under RLUIPA's predecessor statute, the Religious Freedom Restoration Act ("RFRA"). Id. at 901 (citing Diaz v. Collins, 114 F.3d 69 (5th Cir. 1997)). In Diaz, we held that the grooming policy was supported by a compelling interest and that it was narrowly tailored to achieve that interest. Diaz, 114 F.3d at 72-73. Because RLUIPA and RFRA both contain the same test requiring narrow tailoring and a compelling interest, we concluded in Longoria that the district court was not required to reexamine the TDCJ's religious grooming policy to reach a conclusion that Longoria

23

TDCJ's neutral application of the policy call into question whether the TDCJ's application of its policy to the Odinists is narrowly tailored to the TDCJ's asserted interests. Accordingly, the district court improperly granted summary judgment as to Mayfield's RLUIPA claim concerning limitations on the Odinists' ability to congregate for religious meetings.

2

Mayfield also contends that the TDCJ violated RLUIPA through its policy concerning runestones))specifically by preventing personal possession of runestones and banning rune-related literature from the prison library. The district court concluded that Mayfield failed to show a substantial burden on his religious exercise, and also found the TDCJ's runestone policy supported by a compelling governmental interest in maintaining a safe, secure, and efficient prison. Again, the district court reached no conclusion as to whether the runestone policy is the least restrictive means of achieving the TDCJ's asserted interest.

Taking the facts in the light most favorable to Mayfield, we find that the summary judgment record could support a finding that his religious exercise is substantially burdened by the TDCJ's policy preventing possession of runestones. Undisputed evidence shows that TDCJ only allows Mayfield access to runestones when the outside volunteer comes to the prison. Mayfield has submitted evidence that runestones are part of Odinist religious practice, and no questions have been raised as to the "honesty and accuracy of his contention that the religious practice at issue is important to the free exercise of his religion." Adkins, 393 F.3d at 570. Because Mayfield's religion advocates regular, personal study of the runestones in addition to their being used in group

---

failed to state a claim. Longoria, 507 F.3d at 904. We are not presented with the same situation in this case))no prior opinion of this court has fully evaluated the TDCJ's volunteer requirement to reach a holding that the policy is both supported by a compelling interest and is narrowly tailored.

ceremonies, the TDCJ's policy could be seen as substantially burdening Mayfield's exercise of religion because the policy "influences [Mayfield] to act in a way that violates his religious beliefs." Id.

The TDCJ argues that Mayfield simply seeks to act in a way that is not otherwise generally allowed in the prison, and therefore, the policy denying access to runestones cannot be said to cause a substantial burden. See id. (stating that "a government action or regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed."). According to the TDCJ no inmates are allowed to personally possess items posing security risks equal to those posed by runestones. Because he seeks access to items that could be used to gamble, pass secret messages, and identify gang members, the TDCJ argues that Mayfield seeks to act in a way not otherwise generally allowed.[12] However, the TDCJ's argument compresses the steps to our RLUIPA analysis. One can only accept the TDCJ's argument if one first accepts the TDCJ's argument that runestones are in fact like dice, tarot cards, etc. The TDCJ cannot use what is effectively a compelling interest argument to answer the preceding question of whether Mayfield's religious exercise is substantially burdened. Adkins recognizes that an inmate cannot meet RLUIPA's substantial burden requirement by requesting treatment "not otherwise generally allowed." But runestones were not generally disallowed prior to Mayfield's request. Adkins does not allow prison regulators to undermine a policy's substantial burden by comparing a "religious exercise," not previously disallowed, to another disallowed behavior. RLUIPA's standard provides space for these arguments by

---

[12] We note again, as with the § 1983 claim, that these arguments do not address Mayfield's evidence of the TDCJ's limiting access to rune-related literature, as distinct from actual possession of runestones.

allowing the government to show that its policy is narrowly tailored to serve a compelling governmental interest.

For the foregoing reasons, the district court erred in concluding that Mayfield failed, as a matter of law, to establish that the TDCJ's runestones policy imposed a substantial burden on his religious exercise. We find that Mayfield has submitted evidence that could allow a reasonable trier of fact to conclude that the TDCJ's runestones policy substantially burdens his religious exercise. And while the district court found the runestones policy supported by a compelling interest, it did not determine whether the policy was narrowly tailored to serve that interest. Even if we agreed with the district court's compelling interest finding, we could not affirm the district court's grant of summary judgment, as questions remain regarding whether the policy is narrowly tailored.

Since the district court's decision in this case, the TDCJ submitted evidence which expresses its intent to begin a pilot program allowing limited access to runestones. According to TDCJ, the pilot program would allow prisoners to purchase their own set of approved runestones. Under the pilot program the runestones are to be kept in the custody of the unit chaplain and checked out to inmates for use during approved time slots. But according to the evidence submitted, the pilot program has not yet been implemented. Upon remand, the district court should request new evidence concerning the pilot program. The pilot program, if implemented, would alter the TDCJ's runestones policy such that it imposes a lessened burden on Mayfield's religious exercise. Further, the pilot program, as described, would seemingly represent a less restrictive means for carrying out the TDCJ's penological interests in limiting access to runestones. However, according to the evidence before us, the program has not yet been implemented and therefore does not impact our analysis of whether issues of fact currently exist as to Mayfield's RLUIPA claim.

## III

We AFFIRM the district court's summary judgment dismissal to the extent that Mayfield seeks compensatory damages, as those claims are barred by 42 U.S.C. § 1997e(e).

We AFFIRM the district court's dismissal of non-damage claims against the TDCJ.

Because no material issues of fact remain, we AFFIRM the district court's grant of summary judgment as to Mayfield's § 1983 claims against Johnson and Pierce concerning the possession of runestones.

We VACATE the district court's grant of summary judgment as to the following claims: Mayfield's § 1983 claims for declaratory and injunctive relief against Johnson and Pierce, in their official capacities, based on TDCJ's application of the outside-volunteer requirement for religious group meetings and based on the TDCJ's denial of rune-related literature; Mayfield's RLUIPA claims concerning the volunteer policy and the overall runestones policy to the extent they seek declaratory and injunctive relief against Johnson and Pierce, in their official capacities.

Finally, when we reverse a district court's decision to dismiss under the PLRA for failure to state a claim, it nullifies the strike imposed against a prisoner under 28 U.S.C. § 1915(g).   See Adepegba v. Hammons, 103 F.3d 383, 387 (5th Cir. 1996).  Because summary judgment was inappropriate as to some of Mayfield's claims, the district court erred in concluding that Mayfield failed to state a claim under 28 U.S.C. § 1915(e).  See Praylor v. Tex. Dep't of Criminal Justice, 430 F.3d 1208, 1209 (5th Cir. 2005) (stating that we review dismissals for failure to state a claim under the PLRA under the same standard as dismissals under FED. R. CIV. P. 12(b)(6)).  Therefore, we also REVERSE  the district court's decision to impose a strike against Mayfield for failure to state a claim upon which relief could be granted.

27

We REMAND for further proceedings consistent with this opinion.