

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-9-2008

# Robert Smith v. Kenneth Kyler

Precedential or Non-Precedential: Non-Precedential

Docket No. 08-1731

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Robert Smith v. Kenneth Kyler" (2008). *2008 Decisions.* Paper 383.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/383

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

CLD-303                                                    NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-1731
_____

ROBERT T. SMITH,
                                                    Appellant

v.

KENNETH KYLER; RAY EARLSTON, in their official capacities

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 03-cv-0898)
District Judge:  Honorable Thomas I. Vanaskie

_____

Submitted for Possible Dismissal Pursuant to 28 U.S.C. § 1915(e)(2)(B)
or Summary Action Pursuant to Third Circuit LAR 27.4 and I.O.P. 10.6
September 25, 2008

AMBRO, FUENTES and JORDAN, Circuit Judges

(Opinion filed:  October 9, 2008)
_____

OPINION
_____

PER CURIAM

      Robert T. Smith is a Rastafarian inmate confined at the State Correctional

Institution at Huntingdon ("SCI-Huntingdon").  In 2003, he filed a complaint alleging that

SCI-Huntingdon's Superintendent and Facility Chaplaincy Program Director violated the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc et seq. ("RLUIPA"), and the First and Fourteenth Amendments, by refusing to permit weekly group religious services for Rastafarians. He sought only injunctive relief. The United States District Court for the Middle District of Pennsylvania granted the defendants' motion for summary judgment. Smith filed a timely pro se appeal. For the following reasons, we will affirm.

I.

The Pennsylvania Department of Corrections ("DOC") permits inmates to worship as a group if the services are conducted by a Chaplain. The Chaplain may be hired as a full- or part-time employee (a "Facility Chaplain,") or on a contract basis (a "Contract Chaplain"). According to the DOC's Administrator for Religion and Volunteer Services, the DOC will hire a Chaplain to perform the services for the "largest major faith groups within a facility." At SCI-Huntington, the DOC has hired Chaplains to provide religious services for the following groups (approximate number of weekly attendees in parentheses): Catholics (60); Protestants (125); Muslims (175); and Native Americans (25). Because of limited resources, the DOC will not pay for religious leaders for smaller groups. Instead, religious services for these groups must be led by an approved, volunteer outside religious leader (a "Faith Group Leader"[1]). In "extraordinary circumstances,"

[1] The term "Faith Group Leader" also includes staff and contract employees who lead inmate worship services.

2

such as when the Faith Group Leader is ill, a prisoner approved by the facility may lead a religious service. At SCI-Huntington, a Faith Group Leader voluntarily provides religious services for Jews (12), Messianic Jews (15), Jehovah Witnesses (7), and Buddhists (6). In addition to group worship, the DOC allows inmates to meet personally with a designated Religious Advisor, an individual from outside the prison who has received endorsement from a faith group to provide religious counseling and guidance.

Inmates seeking an accommodation based on religion must submit an Inmate Religious Accommodation Form (DC-52) to the Religious Accommodation Review Committee, whose recommendation is forwarded to Regional Deputy Secretary for a decision. In addition to Smith, only two other inmates at SCI-Huntington submitted DC-52 forms requesting Rastafarian services. Those requests were denied. A Rastafarian chaplain employed by the New York Department of Corrections indicated that he would voluntarily provide religious services at SCI-Huntington if the DOC paid his travel expenses. The DOC refused to pay those expenses.

## II.

We review de novo an order granting summary judgment. See Saldana v. K Mart Corp., 260 F.3d 228, 231 (3d Cir. 2001). Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); Fed. R. Civ. P. 56(c). Once the

moving party has carried the initial burden of showing that no genuine issue of material fact exists, the "nonmoving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact." Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 511-12 (3d Cir. 1994). Rather, the nonmoving party "must make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by the depositions and admissions on file." Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992). Only evidence admissible at trial may be considered in ruling on a motion for summary judgment. See Philbin v. Trans Union Corp., 101 F.3d 957, 961 n.1 (3d Cir. 1996).

### III.

Smith alleged that the defendants violated his First Amendment right to free exercise of his faith. Prison inmates do not forfeit their constitutional right to freely exercise their religion when they enter the prison gates. See Cruz v. Beto, 405 U.S. 319 (1972) (per curiam). Incarcerated inmates, however, enjoy their rights under a more limited framework than the average citizen. See O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). Indeed, the fact of incarceration and the valid penological objectives of deterrence of crime, rehabilitation of prisoners, and institutional security justify limitations on the exercise of constitutional rights by inmates. See DeHart v. Horn, 227 F.3d 47, 50-51 (3d Cir. 2000) (en banc). An alleged restriction on an inmate's right to free exercise of religion will be upheld "if it is reasonably related to legitimate

4

penological interests." O'Lone, 482 U.S. at 349 (citing Turner v. Safley, 482 U.S. 78, 89 (1987)). In evaluating the reasonableness of a prison regulation, we consider four factors: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation . . . will have on guards and other inmates, and on the allocation of prison resources generally"; (4) whether there are "ready alternatives that could fully accommodate[] the prisoner's rights at de minimis cost to valid penological interests." Turner 482 U.S. at 89-91 (internal citations and quotation marks omitted). Notably, the restriction must be neutral. Id. at 90; see also Mayfield v. Texas Dep't of Criminal Justice, 529 F.3d 599, 608-09 (5th Cir. 2008).

We agree that Smith's free exercise rights were not violated by the DOC's policy to provide Chaplains for only the largest major faith groups and to prohibit group worship in the absence of an approved, volunteer Faith Group Leader. The District Court correctly noted that the DOC has a legitimate interest in managing limited financial resources and in maintaining prison security. See Thornburgh v. Abbott, 490 U.S. 401, 415 (1989). Those interests are rationally connected to the DOC policy of providing chaplains based on the number of inmates in a particular religious group who would regularly attend services. See Baranowski v. Hart, 486 F.3d 112, 121 (5th Cir. 2007) (stating that prison policy of prohibiting inmates from leading religious services without

5

the assistance of a rabbi or approved outside volunteer was logically connected to penological concerns of security, staff, and space limitations); Anderson v. Angelone, 123 F.3d 1197, 1199 (9th Cir. 1997) ("Requiring an outside minister to lead religious activity among inmates undoubtedly contributes to prison security."). In addition, Smith has alternative means of practicing his religion. The record indicates that, subject to various DOC directives, Rastafarian inmates are permitted to maintain religious books and materials in their cells, can elect to have a Personal Religious Advisor worship with them, and may seek exemptions from the DOC hair length requirement. See DeHart, 227 F.3d at 55 (holding that court must consider whether the inmate has "alternate means of practicing his or her religion generally, not whether [the] inmate has alternative means of engaging in [any] particular practice.").

Furthermore, the DOC persuasively asserts that providing group religious services to Rastafarian inmates would impose a substantial burden on prison staff and resources, and that there are no ready alternatives. For instance, if the DOC paid for a Rastafarian chaplain but did not provide a chaplain for similarly-sized groups, Rastafarians could appear to be favored, a perception that could negatively affect prison morale and discipline. See Adkins v. Kaspar, 393 F.3d 559, 565 (5th Cir. 2004). But, providing a chaplain for all recognized religions at SCI-Huntington, regardless of the number of inmates who wish to attend services, could have a "significant 'ripple effect'" on prison

resources.[2] <u>Turner</u>, 482 U.S. at 90; <u>see also</u> <u>Adkins</u>, 393 F.3d at 565 (stating that "no obvious, easy alternatives would accommodate both" the inmates' request for, inter alia, separate religious services and the administrative needs of the Texas Department of Justice).

Smith contends that there is a factual dispute as to the neutrality of the DOC's regulations. The DOC submitted evidence indicating it provides paid chaplains at SCI-Huntington when the number of inmates who regularly attend religious services equals or exceeds 25. According to the DOC, only three Rastafarian inmates have formally asked to participate in group religious services. Smith disputes these numbers. In an unsworn declaration, Smith identified 37 Rastafarian inmates who had been granted hair length exemptions, 11 inmates who had been granted temporary hair length exemptions, 10 inmates whose hair length exemption requests were pending, and 17 inmates who had received Religious Accommodation Forms (presumably to file hair length exemption requests). Importantly, however, the DOC bases its decision to pay for a chaplain on the number of inmates who formally express their intention to regularly attend religious services, not on the number of prisoners who claim adherence to a particular religion. In

_____

[2] On appeal, Smith asserts for the first time that Native Americans at SCI-Huntington are permitted to worship as a group under the supervision of the Facility Chaplain. He claims that a similar group service could be conducted for Rastafarians. We will not consider issues raised for the first time on appeal. In any event, Smith has provided no evidence to support his claims and has failed to demonstrate that permitting the Facility Chaplain to supervise a Rastafarian service would impose no more than a de minimis cost.

apparent recognition of this more limited focus, Smith also submitted affidavits of 34 SCI-Huntington inmates who expressed an interest in regularly attending Rastafarian services.[3] But only four of those inmates asserted that they had requested Rastafarian services, and the one inmate who stated that the request was in writing did not indicate that it was made on a DC-52 form. Without evidence that these inmates followed the established procedures for seeking a religious accommodation, the affidavits do not create a genuine issue of material fact concerning the neutrality of the DOC's policies.

IV.

The District Court did not err in granting summary judgment to the defendants on Smith's RLUIPA claims. RLUIPA prohibits the government from imposing a substantial burden on a prisoner's religious exercise, even if the burden results from a rule of general applicability, unless the government shows that the burden is in furtherance of a compelling government interest and is the least restrictive means of furthering that interest. See Washington v. Klem, 497 F.3d 272, 277 (3d Cir. 2007). A "substantial burden" exists where: 1) a follower is forced to choose between following the precepts of

_____

[3] In opposition to the motion for summary judgment, Smith also provided a letter from Henry Dennison, another inmate at SCI-Huntington, that identifies 36 inmates who would "like to participate in Rastafarian worship services and Rasta Religious Class." Hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present the evidence through direct testimony, i.e., in a form that "would be admissible at trial." Williams v. Borough of West Chester, 891 F.2d 458, 466 n.12 (3d Cir. 1989). Because the introduction of Dennison's testimony to prove the truth of the 36 inmates' wishes would not be admissible at trial, the letter should not be considered on a summary judgment motion. See Blackburn v. United Parcel Serv., 179 F.3d 81, 95 (3d Cir. 1999).

his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; or 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs. Id. at 280.

Smith claims that the DOC policies and regulations substantially burdened his religious exercise. Importantly, however, the absence of weekly group Rastafarian religious services results from inadequate demand for such services and from "a dearth of qualified outside volunteers available to go to [SCI-Huntington], not from some rule or regulation that directly prohibits such gatherings." Adkins, 393 F.3d at 571. Smith has not been denied a benefit because of his religious beliefs, nor has he been forced to modify his behavior. Cf. Baranowski v. Hart, 486 F.3d 112, 125 (5th Cir. 2007) ("Given the strong significance of keeping kosher in the Jewish faith, the [prison's] policy of not providing kosher food may be deemed to work a substantial burden upon Baranowski's practice of his faith."). In addition, as noted above, Smith may maintain religious books and materials in his cell, he is permitted to have a Personal Religious Advisor worship with him, and he is eligible to seek an exemption from the DOC hair length requirement. Cf. Mayfield, 529 F.3d at 614-15 ("An inability to exercise other means of . . . worship increases the relative burden imposed by the . . . policy preventing group meetings in the absence of an outside volunteer.").

Assuming that the DOC's policy and regulation impose a substantial burden, we

would agree with the District Court that the DOC has demonstrated that the restrictions are the least restrictive means of advancing a compelling governmental interest. When considering these factors, we owe "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter v. Wilkinson, 544 U.S. 709, 722 (2005) (quoting 146 Cong. Rec. S7774, S7775 (July 27, 2000) (joint statement of Sen. Hatch and Sen. Kennedy on RLUIPA)). The DOC maintains that its regulation mandating that religious services be supervised by a Chaplain or Faith Group Leader prevents the creation of an authority structure among inmates, thereby contributing to prison security. See Baranowski, 486 F.3d at 121 (5th Cir. 2007). In addition, hiring a Chaplain to perform religious services only for the "largest major faith groups within a facility," but permitting smaller groups to worship together under the direction of a volunteer Faith Group Leader, is the least restrictive means of furthering the DOC's interests. This policy is a fair means of allocating scarce prison resources because, as the DOC explains, "to pay [for a Rastafarian Chaplain] would require the Department to pay expenses for numerous other religious leaders . . . or else be exposed to a charge of religious favoritism."

V.

Finally, Smith alleged that the DOC violated his rights under the Equal Protection Clause by preventing him from worshiping with other Rastafarians, since Christians,

10

Jews, Muslims, and Native Americans are permitted to attend group religious services. But he has failed to provide any competent summary judgment evidence that similarly situated faiths are treated differently from Rastafarians. See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (stating that the Equal Protection clause does not require that all persons be treated alike, but rather that "all persons similarly situated should be treated alike."); see also Cruz, 405 U.S. at 322 n.2 (recognizing that "[a] special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand."). Accordingly, we agree that Smith has failed to state an equal protection claim sufficient to survive summary judgment. See Williams v. Morton, 343 F.3d 212, 221-22 (3d Cir. 2003).

## VI.

For the above-stated reasons, we conclude that the appeal presents no substantial question. Accordingly, we will affirm. See I.O.P. 10.6.