# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-60218

United States Court of Appeals
Fifth Circuit

**FILED**

February 9, 2017

Lyle W. Cayce
Clerk

PATRICK D'ANTRE FLUKER,

      Plaintiff - Appellant

v.

RONALD KING, sued in individual capacity; HUBERT DAVIS, sued in individual capacity,

      Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:13-CV-521

Before JOLLY, SMITH, and PRADO, Circuit Judges.

PER CURIAM:*

*Pro se* Muslim inmate Patrick Fluker filed a lawsuit alleging that, while he was in restrictive custody ("c-custody") at South Mississippi Corrections Institution ("SMCI"), Superintendent Ronald King and Deputy Warden Hubert Davis ("Appellees") violated the First Amendment's Free Exercise Clause, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and the

---

* Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-60218

Fourteenth Amendment's Equal Protection Clause by prohibiting him and other Muslim c-custody inmates from attending Jumu'ah services[1] outside of the c-custody unit while allowing non-Muslim c-custody inmates to attend out-of-unit religious services.  In this appeal, Fluker challenges the district court's[2] grant of summary judgment in favor of Appellees.  He contends that the court erred because: (1) his claim for injunctive relief is not moot; (2) he is entitled to damages against Appellees in their individual capacities; and (3) Appellees are not entitled to qualified immunity.  For the following reasons, we AFFIRM.

I.

While Fluker was incarcerated at SMCI, he was housed in c-custody, a section of the prison reserved for inmates who violated prison rules, from August 2012 to October 2013.  According to Fluker, Appellees implemented a new policy in September 2012 that prohibited all c-custody inmates from attending activities outside of their unit ("the Policy").  As a result of the Policy, Fluker claims that he could not continue attending Jumu'ah services, as his faith required, because they were held outside of the c-custody unit.

Fluker promptly availed himself of SMCI's Administrative Remedy Program ("ARP"), submitting multiple grievances contending that the Policy violated his religious rights and asking that he be allowed to attend Jumu'ah services.  Davis, the ARP first step respondent, denied Fluker's request, informing him that he was:

> free to exercise any religion [he] cho[]se. However, due to [his] poor institutional behavior and [his] refusal to abide by [Mississippi Department of Corrections] Policy and Procedures[, he was] housed in a restrictive custody unit.  The restrictive custody [sic]

---

[1] Jumu'ah is "a weekly Muslim congregational service" that is "commanded by the Koran and must be held every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 345 (1987).

[2] The parties consented to a magistrate judge conducting all proceedings.

No. 15-60218

does not allow out-of-unit activities; as such, [he was] absolutely free to exercise any religion or practice any faith [he] so cho[]se as long as it [was] in [his] assigned housing unit.

Unsatisfied with this response, Fluker appealed to the second step respondent, King. King likewise denied Fluker's request, stating that:

[t]he fact you are not allowed to attend the formal services is not an act of discrimination[;] it is a matter of security. Due to a poor record of institutional behavior[,] you are being housed in a unit reserved for restrictive custody. Just because you are not allowed to attend activities outside of the unit does not mean you are being denied an opportunity to practice your faith.

Having exhausted his administrative remedies, Fluker was eligible to seek judicial review.

In April 2013, Fluker filed a complaint under 42 U.S.C. § 1983 and RLUIPA in the district court, seeking punitive damages and an injunction requiring Appellees to allow c-custody inmates to attend Jumu'ah services. Fluker's overarching complaint was that, despite the Policy, non-Muslims were allowed to attend an out-of-unit Jehovah's Witness service on January 16, 2013, and an out-of-unit Kairos service on March 27, 2013, yet he and other Muslims were not allowed to attend out-of-unit Jumu'ah services.

In August 2014, Appellees moved for summary judgment, contending that: (1) Fluker's claim for injunctive relief was moot because he had been transferred from SMCI to Walnut Grove Correctional Facility; and (2) they were entitled to sovereign and qualified immunity.

In March 2015, the district court granted Appellees' motion and entered judgment on all of Fluker's claims. The court first held that Fluker's claim for injunctive relief was moot because he had been transferred from SMCI's c-custody and had not established a demonstrated probability or a reasonable expectation that he would be returned there. Additionally, the court held, Fluker's claims for damages against Appellees in their official capacities were

No. 15-60218

barred by the Eleventh Amendment.  Moreover, the court found, Fluker's claims for damages against Appellees in their individual capacities failed. RLUIPA does not support this cause of action.  Fluker had not shown that Appellees violated the Equal Protection Clause because he had not shown that any unequal treatment he received stemmed from invidious religious discrimination.  And the Policy did not violate the Free Exercise Clause because, under *Turner v. Safley*, 482 U.S. 78 (1987), it was reasonably related to legitimate penological interests.  Finally, the court found that it need not address whether Appellees were entitled to qualified immunity because Fluker's claims were not constitutionally cognizable.

Fluker has timely appealed.  He contends that the district court erred in granting summary judgment because: (1) his claim for injunctive relief is not moot given the lingering effect of Appellees' actions and his reasonable expectation of being transferred back to c-custody at SMCI and subjected to the same action again; (2) he is entitled to damages against Appellees in their individual capacities due to their denial of his right to freely exercise his religion, which is protected by RLUIPA and the Free Exercise and Equal Protection Clauses; and (3) Appellees are not entitled to qualified immunity because they violated his First Amendment right to freely exercise his religion.

II.

"This court reviews a summary judgment *de novo*, using the same standard as that employed by the district court."  *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012).  A court should "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a). "No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *City of Alexandria v. Brown*, 740 F.3d 339, 350 (5th Cir. 2014) (citation omitted).  When determining

No. 15-60218

whether summary judgment is appropriate, the court must "consider all of the evidence in the record," "refrain from making credibility determinations or weighing the evidence," and "draw all reasonable inferences in favor of the nonmoving party." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citations omitted). A party cannot, however, "defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Id.* (citation and internal quotation marks omitted).

## A.

We begin by considering whether the district court erred in granting summary judgment on Fluker's claim for injunctive relief. While Fluker acknowledges that he is no longer housed in c-custody at SMCI, he nonetheless argues that his claim is not moot because he has a reasonable expectation of being transferred back and subjected to the same discriminatory action again because he has already been placed into c-custody twice. Moreover, he asserts, Appellees' actions have a continuing effect.

The district court properly concluded that Fluker was not entitled to injunctive relief. Fluker's transfer from SMCI to another correctional facility "rendered his claims for . . . injunctive relief moot." *Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001). "And any suggestion of relief based on the possibility of transfer back . . . is too speculative to warrant relief." *Id.*

## B.

Fluker also argues that the district court erred in granting summary judgment on his RLUIPA claim. Appellees, Fluker contends, placed a substantial burden on his religious exercise without using the least restrictive means necessary to do so. This claim, he asserts, is demonstrated by the fact that Appellees allowed non-Muslim c-custody inmates to attend out-of-unit religious services, yet Appellees neither allowed Muslim c-custody inmates to

5

No. 15-60218

attend out-of-unit Jumu'ah services nor provided them with the means to hold in-unit services.

The district court correctly held that Fluker's RLUIPA claim cannot survive summary judgment because "RLUIPA does not create a cause of action" for damages against Appellees "in their individual capacities." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 331 (5th Cir. 2009).

C.

Next, Fluker contends that the district court erred in granting summary judgment on his equal protection claim. Appellees, Fluker argues, violated his equal protection rights by favoring other religions over Islam. Specifically, Appellees allowed non-Muslim c-custody inmates to attend an out-of-unit Jehovah's Witness service on January 16, 2013, and an out-of-unit Kairos service on March 27, 2013, while denying him and other c-custody Muslims the opportunity to attend any out-of-unit Jumu'ah services.

The district court properly granted Appellees summary judgment on Fluker's equal protection claim. To establish an Equal Protection Clause violation, Fluker "must prove purposeful discrimination resulting in a discriminatory effect among persons similarly situated." *Baranowski v. Hart*, 486 F.3d 112, 123 (5th Cir. 2007) (citation omitted). "Discriminatory purpose" here "implies that the decisionmaker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group." *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir. 1995) (citation omitted). Notably, the Equal Protection Clause does not require "that every religious sect or group within a prison . . . must have identical facilities or personnel"; it requires only that prison officials afford inmates "reasonable opportunities . . . to exercise the[ir] religious freedom." *Baranowski*, 486 F.3d at 123 (citations omitted).

6

No. 15-60218

No one disputes that Fluker was not allowed to attend out-of-unit Jumu'ah services after Appellees implemented the Policy. And Fluker produced a memorandum from SMCI Chaplain Kenneth Powell stating that "seven (7) close custody offenders . . . attend[ed] [an out-of-unit] Kairos [service] on March 27, 2013." Thus, the record demonstrates that, on one occasion,[3] Fluker was treated differently from similarly situated c-custody inmates.

But Fluker has not pointed to any evidence indicating that Appellees' motivation for treating him differently was invidious religious discrimination. Appellees rejected Fluker's request to attend out-of-unit Jumu'ah services explicitly because of his "poor record of institutional behavior." Further, nothing in the record indicates that Appellees used the Policy to treat Muslim and non-Muslim c-custody inmates differently. The record does not establish that the Kairos service here was anything other than nondenominational. As the district court noted, Fluker "did not provide information regarding the content of the Kairos service/event." Fluker never stated what faith tradition is associated with Kairos services or the religion of the inmates who attended the service in question. And the only information in the record about this service is that it was open to offenders of all religions, seven c-custody inmates attended, and one c-custody attendee was a Muslim (the religious affiliations of the other six were never disclosed).

Still further, the affidavits from c-custody inmates that Fluker himself submitted indicate equal, not disparate, treatment. Jackey Gholar attested that Appellees were "denying *all* C-Custody . . . inmates their rights to attend Religion Services due to [their] custody level" and that "*[a]ll* C-Custody . . .

---

[3] Fluker has not "come forward with specific facts indicating a genuine issue for trial" on his claim that other c-custody inmates attended a Jehovah's Witness service on January 16, 2013. *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 940 (5th Cir. 2005) (citation omitted). Chaplain Powell swore that "c-custody offenders were not allowed to attend, and did not attend," that service. Fluker simply rested on his unsubstantiated allegations.

inmates are being forced to exercise their religion and/or practice their faith in their assigned housing unit." And Quartaveous Strickland swore "that Christians and Muslims both are being denied the rights to attend worship services . . . [d]ue to our custody level." Fluker does not challenge the accuracy of these statements.

Moreover, the record indicates that Appellees afforded Fluker reasonable opportunities to exercise his religion. The record shows that Appellees permitted Muslim c-custody inmates to attend some Muslim out-of-unit services. As c-custody inmate Ricky Moore attests in his affidavit, "Restrictive Custody Muslims were allowed to participate in the Eidul Fitr (the celebration of the completion of Ramadan) with the General Population in which all feasted together." Fluker does not challenge the accuracy of this statement. Additionally, Davis stated that Fluker was "absolutely free to exercise any religion or practice any faith [he] so cho[]se as long as it [was] in [his] assigned housing unit." And King emphasized that Fluker was not "being denied an opportunity to practice his faith"—he was simply "not allowed to attend activities outside of the [c-custody] unit."

Fluker counters this evidence with only his conclusional assertion that Appellees treated him and other Muslim inmates differently based on their faith. Such conclusional assertions are not enough to create a genuine issue for trial. *See Turner*, 476 F.3d at 343 (citation omitted). Thus, Fluker has failed to show that Appellees acted with purposeful discrimination; the district court therefore did not err in granting summary judgment on this claim.

## D.

Fluker also asserts that the district court erred in granting summary judgment on his free exercise claim. Fluker challenges the court's application of the first and second *Turner* factors, referred to below. While his argument is somewhat disjointed, we understand his argument to be that the Policy is

not rationally related to a legitimate penological interest because Appellees treated Muslim c-custody inmates differently than non-Muslim c-custody inmates. This discrimination against Muslims, he claims, is apparent from the facts that Appellees: (1) prohibited him and other Muslim c-custody inmates from attending Jumu'ah services while permitting non-Muslim c-custody inmates to attend a Jehovah's Witness service and a Kairos service; and (2) provided only non-Muslim c-custody inmates with an alternative means of attending religious services.

The district court did not err in granting summary judgment on this claim. The Supreme Court has explained that a prison regulation may "impinge[] on inmates' constitutional rights" as long as "it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. To determine whether a regulation is "reasonable," courts must consider four factors: (1) whether there is "a valid, rational connection between the prison regulation and the legitimate[, neutral] governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted . . . right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there is a "ready alternative[]." *Id.* at 89–90 (citation and internal quotation marks omitted). Courts are not, however, required "to weigh evenly, or even consider, each of these factors." *Scott v. Miss. Dep't of Corrs.*, 961 F.2d 77, 80 (5th Cir. 1992). "Factor one" is "controlling"; "the other factors merely help a court determine if the connection *is* logical." *E.g., id.* at 81.

### 1.

As an initial matter, the district court did not err in analyzing the second *Turner* factor. Even if the Policy was applied to exclude some c-custody inmates from attending Jumu'ah services, that alone is not determinative. *See*

No. 15-60218

*O'Lone*, 482 U.S. at 351–52 (upholding a prison regulation that prevented inmates from attending Jumu'ah services, even where the Court recognized that "[t]here [were] . . . no alternative means of attending Jumu'ah").  The key inquiry is whether inmates "retain the ability to participate in other . . . religious ceremonies" in their faith tradition.  *Id.* at 352; *accord, e.g., Mayfield v. Tex. Dep't Of Criminal Justice*, 529 F.3d 599, 609–10 (5th Cir. 2008) (citations omitted).  And Appellees did not prevent Fluker from generally participating in Muslim ceremonies.  As Davis explained, c-custody inmates were "absolutely free to exercise any religious or practice any faith [they] so cho[]se as long as" they did so "in [their] assigned housing unit."

2.

The district court also did not err in analyzing the critical first *Turner* factor.  This factor requires a multi-faceted analysis.  A court must: (1) identify the regulation in question and the governmental objective justifying it; and (2) "determine whether the governmental objective" is: (A) "legitimate"; (B) "neutral"; and (C) "rationally related to" the regulation.  *See McFaul*, 684 F.3d at 572 (citation omitted).

The district court properly articulated the regulation in question as "prohibiting inmates in restrictive custody from attending activities outside of their unit" and the governmental interest justifying the regulation as ensuring "the safety and security of the prison."

The district court also correctly recognized that the "internal security of detention facilities is a legitimate governmental interest."  *E.g., Block v. Rutherford*, 468 U.S. 576, 586 & n.8 (1984).

Nor did the district court err in finding that the Policy was neutrally applied among all religions.  Fluker has failed to point to specific facts indicating that Appellees used the Policy to specifically prevent c-custody Muslims from attending out-of-unit religious activities.  As discussed above,

his assertion that non-Muslim c-custody inmates were allowed to attend a Jehovah's Witness service is nothing more than an unsubstantiated allegation. Granted that the record indicates that several c-custody inmates were allowed to attend one Kairos service, but, as detailed in Part II.C, there is no evidence that Muslim and non-Muslim c-custody inmates were treated differently.

Finally, the district court did not err in holding that the Policy was rationally related to SMCI's safety and security. As King explained in an affidavit, c-custody inmates "are the highest risk population inmates and pose a threat to the safety and security of the prison." And "keeping vulnerable or dangerous prisoners apart is a rational way to achieve [the] goal" of ensuring the safety and security of a prison. *E.g.*, *Fortner v. Lowndes Cty. Adult Det. Ctr.*, No. 1:12CV192-SA-DAS, 2014 WL 3746642, at *3 (N.D. Miss. July 29, 2014). It certainly "cannot seriously be maintained [here] that the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational," especially because we must "give great deference to prison administrators' judgments regarding jail security." *O'Lone*, 482 U.S. at 351 (citation omitted); *Oliver v. Scott*, 276 F.3d 736, 745 (5th Cir. 2002) (citations omitted). The district court therefore did not err in applying the first and second *Turner* factors and thus correctly granted Appellees summary judgment on Fluker's free exercise claim.

E.

Finally, turning to the issue of whether Appellees are entitled to qualified immunity, we hold that this issue is moot because Fluker has not stated the denial of a constitutional right. *Wells v. Bonner*, 45 F.3d 90, 94 (5th Cir. 1995) (citation omitted).

III.

For the foregoing reasons, the judgment of the district court is AFFIRMED.